UNITED STATES of America,
Plaintiff,

v.

Rafael GONZALEZ a/k/a "Lucky" and
Rafael Torres, Defendants.

No. 72 Cr. 1351.

United States District Court,
S. D. New York.

Aug. 15, 1973.

Paul J. Curran, U. S. Atty., S.D.N.Y. (W. Cullen McDonald, Asst. U. S. Atty., of counsel), for United States.

Goldberger, Asness, Feldman & Breitbart, New York City (Paul A. Goldberger, New York City, of counsel), for defendant Rafael Torres.

## OPINION

BAUMAN, District Judge.

Rafael Torres was indicted along with Rafael Gonzalez for conspiracy to violate various provisions of the federal narcotics laws, 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). He now moves to suppress (1) $100,000 in United States currency seized at the time of his arrest by members of the New York Joint Task Force for Drug Control and (2) his admissions made subsequent to arrest concerning his role in narcotics trafficking. A four day evidentiary hearing was held, and what follows constitutes my findings of fact and conclusions of law.

In mid-1971, the attention of various members of Group 9 of the Joint Task Force began to focus on two men: Rafael Gonzalez and Edward Arroyo.[1] One patrolman, Alan Ruggiero, had been told by several individuals arrested for narcotics violations in and around the lower east side of Manhattan that Gonzalez was the "big guy" or major distributor. In November, 1971, the group received an informer's tip that Gonzalez and Arroyo had, two months before, received a shipment of 47 pounds of heroin. This report also identified the Monterey Bar on Hester Street in the lower east side as the center of their operations.

Intensive surveillance in and around the Monterey Bar began almost immediately. Both Arroyo and Gonzalez were observed there, driving around the lower east side, and on several occasions, delivering brown paper packages to individuals in neighboring buildings, or picking up individuals carrying such packages. On December 20, 1971, Octavio Pons, a detective assigned to the Task Force, entered the Monterey Bar and struck up a conversation with Gonzalez, whom he recognized as a boyhood acquaintance. Gonzalez first warned Pons that the bar was under police surveillance as a "hangout for drug pushers" and then described his involvement in narcotics dealing. He boasted of the large profits he made, and pointed out how wealthy all of his workers in the traffic had become. At one point two people[2] approached Gonzalez and expressed satisfaction with the quality of the "stuff" they had been receiving. Pons had on a previous occasion (December 13) seen Arroyo in the company of Gonzalez, and upon returning to the bar on December 22, was told by Arroyo that Gonzalez would be in Puerto Rico for approximately one month.

On January 5, 1972, the Task Force was informed that Arroyo had been arrested in Miami in possession of approximately 243 pounds of heroin and, on

1. Both Arroyo and Gonzalez were named as defendants in another narcotics conspiracy case, United States v. Arroyo et al., 72 Cr. 1326. They were tried before me and found guilty of both distributing heroin and conspiring so to do. On July 30, 1973 they were sentenced and their appeals are now pending.

2. Louis Fragliossi and Frank Vispisiano. Both were named as defendants in 72 Cr. 1326.

January 13, was told that another 142 pounds had been seized.

On January 18, 1972, two members of the Task Force saw Gonzalez and Mr. and Mrs. Torres emerge from Lucy Jung's bar at 206 Canal Street. The agents trailed them to a delicatessen at the corner of Eldredge and Houston Streets, and thence to the vicinity of Broome and Allen Streets, where both men left the car for a brief period. All three then drove to the City Squire Motel, 51st Street and Seventh Avenue, where (as the agents later learned) Torres was staying. Fifteen minutes later the two men reappeared and then drove back to the Broome and Allen Street area with the police still in attendance. They parked and entered a building in which they remained for approximately forty-five minutes. After reentering the car they drove off at what Patrolman Ruggiero characterized as an "excessive rate of speed", losing him in the process. (It is important to note at this point that no Task Force agent had ever before seen or heard of Torres. He had neither been mentioned in any informer's report, nor was there any information connecting him with the arrest of Arroyo in Florida.[3])

The following day, January 19, Gonzalez was observed entering and leaving a building on the same block near Broome and Allen Streets that he and Torres had visited the previous evening. Some two hours later, at approximately 7:45 P.M., he entered the City Squire Motel, which had by this time been staked out by a surveillance team of several agents. Shortly thereafter he emerged with Mr. and Mrs. Torres and they proceeded to Forno's Restaurant, 236 West 52nd Street.

When they returned to the motel at about 9:30 P.M., Anthony Pitruzzello, then a sergeant in the Joint Task Force, entered the elevator with them and accompanied them to the 10th floor. He returned to the lobby and checked to see if any persons with Hispanic names were registered on that floor. While he was checking, Gonzalez and Torres left the hotel and rode down to the lower east side, again to the Broome-Allen Street area where the surveilling agents lost sight of them.

At approximately 11:00 P.M. Gonzalez and Torres returned to the City Squire, and at this point the accounts of the Task Force agents on the one hand, and Torres on the other, diverge markedly. It is undisputed that Torres left the car and Gonzalez drove on. According to the members of the Task Force who testified (Pitruzzello and John Crowe) the car pulled up in front of the motel and Torres went directly inside carrying a brown paper package. Torres' account, which I do not credit, is that he emerged from the car carrying the $100,000, as well as various business documents, in a large satchel or valise and went across the street to a delicatessen, where he purchased food for breakfast the following morning. He says that he then entered the motel carrying both his satchel (containing the $100,000) and a brown paper bag (containing groceries).

As Torres was entering the motel, Pitruzzello let forth with a resounding "Let's get them", which was heard not only by the others in his car, but by all other Task Force Units over the car radio. Thereupon Pitruzzello, Crowe, Michael Downs, and Joseph Nunziatta ran into the motel and accosted Torres as he was approaching the elevator. Nunziatta placed his hand on Torres' arm and said "Hold it" and simultaneously grabbed the brown paper package that Torres was holding. He gave the package to Pitruzzello, who discovered that it contained $100,000 in $100 bills bound with rubber bands.

Torres was then taken to a men's room a few feet from the elevators. Without being given any of the warnings mandated by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he was asked what his name was, what the money was for, and how

---

3. Torres was not a defendant in 72 Cr. 1326.

he knew Gonzalez. Torres replied that he was in the clothing business, that he was in New York on a purchasing trip, and that Gonzalez was a business associate. The agents then appeared to consider the men's room unsuitable for this interrogation and removed Torres to an open unused elevator. At that point they explained to Torres that they were not robbers after his money but policemen and federal agents. Then, according to the testimony of Crowe, Nunziatta read to Torres the *Miranda* warnings from a form known as a BND 12.[4] Torres nodded in acknowledgement as the statement was read. On this point as well there is vigorous disagreement. Torres testified that he was never given any such warnings, and in fact demanded on several occasions to see a lawyer. I credit the testimony of the government witnesses.

While Torres was still detained in the elevator, Pitruzzello spoke by telephone to Charles Updike, an Assistant U.S. Attorney, and one Sherris, a legal adviser to the Task Force. Updike suggested that Torres' room be searched, either with his consent, or, if he withheld his consent, pursuant to a search warrant. According to the agents, Torres was asked permission to search his room and immediately consented, insisting that he had nothing to do with heroin trafficking and thus had nothing to hide. Torres disputes this and insists that he never gave permission to search. Again, I find that he consented to the search.

The agents and Torres went to his room, where they found Mrs. Torres dressed for bed. They then conducted a thorough search of the premises, but the only meaningful discovery was a piece of tinfoil containing 1.3 grams of heroin underneath the linen in the bathroom. When asked, Torres said that he was keeping it for a friend. At that point Torres was handcuffed and told he was under arrest.

Torres was then taken by Crowe and Pitruzzello to the McAlpin Hotel, apparently because agents had found a matchbook in Torres' room with a McAlpin room number written on it and concluded that another member of the conspiracy might be located there. The visit proved unproductive, however. They proceeded to the Joint Task Force office where Torres was fingerprinted, photographed, and questioned about his family and background. At about 2:00 A.M. on January 20 he was delivered to the Federal House of Detention. During the course of his transportation Torres was, at several points, asked about the source of the $100,000 and the uses to which it would be put.[5]

On the morning of January 20, Torres was taken to the office of James Tierney, then an Assistant U.S. Attorney for the Southern District of New York. Tierney advised him of his rights, including his right to have counsel present. He then took Torres' "pedigree" and began to question him about

---

4. A "BND 12" reads as follows:

"Before we ask you any question it is my duty to advise you of your rights.

Do you understand that you have a right to remain silent?

Do you understand that anything you say can and will be used against you in court or other proceedings?

Do you understand that you have your right to talk to a lawyer before we ask you any questions and to have him with you during the questioning?

If you cannot afford or otherwise obtain a lawyer and you want one a lawyer will be appointed for you by the U.S. Commissioner or the Court and we will not ask any questions until he has been appointed.

If you decide to answer now with or without a lawyer you still have the right to stop the questioning at any time or to stop the questioning for the purpose of consulting a lawyer. However, you may waive the right to advice of counsel and your right to remain silent and you may answer questions or make a statement without consulting a lawyer if you so desire."

5. During the entire duration of his custody that evening it appears that he was only given *Miranda* warnings on the one occasion already mentioned. No agent who testified was able to recall any recitation of the warnings other than that made by Nunziatta in the elevator. Torres, of course, disputes even this.

the $100,000. Torres explained that he was in the clothing business and that he had accumulated the money, in anticipation of this buying trip, over a long period of time. At some point during this account Patrolman Crowe of the Task Force, who had been present during the interview, interrupted and stated that he had been informed that the wrappers on the money were recently dated and were from New York banks. Torres, I find, then admitted that he had been lying, and stated that $50,000 was his, and the other $50,000 belonged to Gonzalez. His $50,000, he stated, was a loan to finance the purchase of a shipment of heroin for which he expected Gonzalez to repay him $75,000 after the heroin was sold. Because the heroin had not arrived on the anticipated date, Gonzalez had instructed Torres to return to Puerto Rico with the money because it would be safer there and await his call.

Tierney proposed that Torres cooperate with the government in uncovering the importation conspiracy. He suggested, and Torres agreed, that federal agents accompany Torres to Puerto Rico and record his anticipated phone conversations with Gonzalez. Torres would then return to New York and inform agents of the time and place where the heroin transaction would be consummated. Tierney also told Torres that he would have to be arraigned. When Torres expressed concern that his name appear in public records, Tierney pointed out that he could waive arraignment. Torres agreed to the waiver.

During the interview Tierney twice received telephone calls from Matthew Salko, an attorney purporting to represent Torres. Salko had been called by Gonzalez at 2:00 A.M. on the morning of the 20th. He met with Gonzalez in the early morning, picked up Mrs. Torres at the motel and took her to a bail bondsman. He attempted, without success, to locate Torres at both state and federal courthouses and institutions.

In his quest to locate Torres, Salko finally succeeded in reaching Tierney by phone. Tierney told Torres that a lawyer claiming to represent him was calling and asked if he wished the lawyer to come to Tierney's office. Torres said that he didn't want the lawyer to know anything. Tierney, with Torres sitting at his side, told Salko that Torres was not there and that he understood Torres had been arrested but not yet arraigned. He suggested that Salko call back in an hour. When Salko did, Tierney advised him that the charges against Torres had been dismissed and that he had already left the courthouse.

On the evening of the 20th the law enforcement officers took Torres and his wife to the Holiday Inn Motel, where they were lodged at government expense and guarded by several Task Force agents in a manner befitting a cooperating defendant. During that evening Torres discussed the details of his cooperation with agents Pitruzzello, Crowe, Lloyd Hurst and Ralph Nieves. After he had slept on the proposition he told Tierney at the United States Attorney's Office that he had changed his mind and wished to be arraigned. That was done that afternoon on a charge of possessing 1.3 grams of heroin and his bail was fixed at a personal recognizance bond of $100,000. Mr. and Mrs. Torres then returned to Puerto Rico.

Torres now contends that the $100,000 should be suppressed as the fruit of an illegal search and seizure and that his statements to Tierney and the various agents should likewise be suppressed because given in the absence of *Miranda* warnings. After a thorough examination of the record, I have concluded that his motion should be granted in its entirety. Both the search that yielded the $100,000 and all subsequent statements were tainted by what I have concluded was an unlawful arrest.

I.

■■ Although the question presented for resolution here can be accurately denominated a knife edge proposition,

one conclusion is indisputable: despite the government's arguments to the contrary, it is clear that Torres was arrested as soon as he was accosted in the City Squire Motel. The government argues that Torres was not arrested until after the heroin was discovered in his room, at which time he was formally told that he was under arrest. This interpretation accords neither with the applicable precedents nor with common sense. As soon as the liberty of movement of a suspect is restricted by law enforcement officials (other than what has come to be known as an investigatory "stop"), an arrest is complete. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Boston, 330 F.2d 937 (2nd Cir. 1964); Moran v. United States, 404 F.2d 663 (10th Cir. 1968). No formula need be uttered nor declaration made to the person arrested; it is sufficient that he be aware that he has been deprived of his full liberty. United States v. Baxter, 361 F.2d 116 (6th Cir. 1966); Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (1961); Kelley v. United States, 111 U.S.App.D.C. 396, 298 F.2d 310 (1961); United States v. Hooper, 320 F.Supp. 511 (E.D.Tenn.1970); United States ex rel. Hollman v. Rundle, 329 F.Supp. 1052 (E.D.Pa.1971).

Here, Torres was apprehended and interrogated by at least four agents. After the interrogation in the lavatory he was moved to the unused elevator. While the questioning continued there, the police warned him of his rights and continued their inquiries long enough for Nunziatta to call an Assistant U.S. Attorney who ordered that Torres' room be searched even if a warrant had to be obtained. Under all the circumstances I find irresistible the legal conclusion that Torres was, in fact, under arrest. In United States v. Lampkin, 464 F.2d 1093 (3rd Cir. 1972), to cite one recent example, it was held that a suspect was arrested when agents, with guns drawn, halted him and told him of their identity, in that he was then under the control of officers who had demonstrated an intention to take him into custody under their authority as government agents. In Henry v. United States, supra, the mere stopping of a car by federal agents sufficed to constitute an arrest of its passengers. Here, from the moment Pitruzzello issued his call to "get" Torres, it was obvious that the agents wished to do more than engage in an admonitory chat with him.

## II.

There remains the much more difficult question of whether the arrest and attendant search were violative of the Fourth Amendment. The government advances two theories: (1) either the agents had probable cause to effect the arrest to which the search was incidental under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), or (2) if not, the detention of Torres constituted a valid stop and frisk under the applicable New York law. I shall consider each of these theories in turn.

The prevailing definition of probable cause was set forth in Stacey v. Emery, 97 U.S. 642, 24 L.Ed. 1035 (1878) and followed in Henry v. United States, supra: "[p]robable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Such a sweeping formulation, however, offers relatively little specific guidance and thus I am mindful of the Supreme Court's recent observation that "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." Sibron v. New York (1968) 392 U.S. 40 at 59, 88 S.Ct. 1889 at 1901, 20 L.Ed.2d 917. The question of probable cause in this factual context is admittedly an extremely close one and the precedents help hardly at all. Such cases tend to have been decided on their facts, and it is difficult to deduce gener-

al principles or lines of authority. Hence the factual setting must be examined here with some care.

■ The government argues that the following factors, individually and in combination, were more than sufficient to constitute probable cause for the arrest of Torres. First, he had been seen with Gonzalez, a well known narcotics wholesaler. Second, he had been seen with Gonzalez in an area (Broome-Allen Street) where narcotics trafficking was intensive. Third, when followed on January 18 from this area, they drove away fast enough to elude their surveillants. Fourth, their pattern of driving around and stopping briefly in buildings on the lower east side conformed, in broad outline, to the pattern of activity of the narcotics dealers observed in and around the Monterey Bar during November and December, 1971. Finally, as he entered the motel Torres was carrying a bag similar to those carried by others in previously observed transactions. (The government also seeks to draw certain inferences from the restaurants Gonzalez and Torres frequented, but I scarcely find that convincing.) No weight, of course, can be attached to the actual discovery of the $100,000, for it is well settled that an arrest cannot be justified by its fruits. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ I conclude that these factors do not add up to probable cause for the arrest of Torres. Although Gonzalez was a notorious narcotics dealer, nothing whatsoever was known about Torres before the day of arrest including his name. He had been seen for the very first time by Task Force agents the day before, although the activities of Gonzalez had been closely followed for months. Gonzalez' notoriety cannot be imputed to Torres, and any suggestion to the contrary has ominous implications for the Fourth Amendment. In United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), it was held that "pre-sumptions of guilt are not lightly to be indulged from mere meetings." The Court expanded on that observation in a passage that has relevance here:

"The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is far fetched when the meeting is not secretive or in a suspicious hideout but in broad daylight, in plain sight of passers-by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal." 332 U.S. at 593, 68 S.Ct. at 228.

■ Nor are the trips to Broome and Allen Streets entitled to great weight. The government would have us believe that this area (and indeed the entire lower east side) is one of intense narcotics activity. It is also, after all, the area where Gonzalez lived. People v. Brown, 24 N.Y.2d 421, 301 N.Y.S.2d 18, 248 N.E.2d 867 (1969), offers guidance on the relevance of area reputation. In that case a policeman saw the defendant and one whom he suspected of being an addict in "an area where any narcotics can easily be had." He saw the suspected addict enter a building, emerge, approach the defendant and apparently hand him something. The two men then walked quickly away in opposite directions and the defendant was arrested. The court noted "[a]lthough the observed acts of the defendant and the suspected narcotic addict were not inconsistent with a culpable narcotics transaction, they were also susceptible of many innocent interpretations, even between persons with a narcotics background." The behavior was at most "equivocal and suspicious". I therefore read the Court of Appeals' opinion to suggest that the reputation of an area, although it may create suspicions about otherwise innocent activities, cannot furnish probable cause when the activities themselves are unexceptional. Applying that teach-

ing to the facts of this case, no weight can be attached to driving a car into and stopping in an area with an unsavory reputation when nothing inherent in the movements of Gonzalez and Torres should have aroused suspicion.

I am similarly unimpressed by the government's reliance on Torres' possession of a brown paper bag upon entering the motel. A recent view of the importance that can be accorded such commonplace receptacles can be found in People v. Corrado, 22 N.Y.2d 308, 292 N.Y.S.2d 648, 239 N.E.2d 526 (1968). Two policemen had staked out a particular street corner on a tip from an undercover agent that a pound of marijuana would be sold there at a certain time. The policemen observed three teenagers sitting in a car and then saw one leave the car to accept four manila envelopes from the occupants of a car parked elsewhere at the corner. He then returned to his own car and handed the envelopes to another passenger who immediately bent over and placed them on the floor. The police immediately seized the envelopes, which did indeed contain marijuana. The New York Court of Appeals found that no probable cause existed, saying: "[e]ven if we accept the argument that such demeanor would be characteristic of modus operandi used for a 'drop', this conduct is far more easily explained by the typical activities of three teenagers than by the fact that the three were handling contraband." Nor was the court impressed by police testimony that this was the only type of envelope used in marijuana transactions. As it pointed out, the envelopes could have contained virtually anything, and their use could not raise the level of inference from suspicion to probable cause.

I not only accept the reasoning of *Corrado*, but I believe it to accord with the pronouncement of the Supreme Court in Henry v. United States, supra: "[t]he fact that packages have been stolen does not make every man who carries a package subject to arrest nor the package subject to seizure. The police must have reasonable grounds to believe that *the particular package carried* by the citizen is contraband." (emphasis supplied).

In conclusion, I find that the Task Force agents did not have probable cause to arrest Torres. Several factors, present in other cases where courts have found probable cause (see e. g. United States v. Christophe, 470 F.2d 865 (2nd Cir. 1972)), are missing here. The agents received no tip from an informer, reliable or otherwise, that there would be a narcotics transaction or that Torres was a narcotics trafficker. There was nothing intrinsically suspicious in the activities of Torres and Gonzalez: no furtive movements, no suggestion of flight.[6] There were no conversations between the two men overheard that might suggest illegal activity. The agents knew nothing whatsoever about Torres or his background: he could have been Gonzalez' cousin or, as counsel aptly points out, his lawyer. Perhaps most significant of all, at the very moment the agents saw him enter the motel, they had been completely ignorant of both his activities and his whereabouts for the past hour and a half. They knew only that he had driven downtown. (The activities that had been observed earlier in the evening, eating dinner at a well known mid-town restaurant and going to and from a hotel, could have raised no suspicion whatever.) Given all these circumstances, I cannot conclude that a prudent man would have been warranted in believing that an offense had been committed by Torres that night. The observation of the Supreme Court in Henry v. United States, supra, is apt here: "Under our system

---

6. Patrolman Ruggiero's observation that Gonzalez and Torres drove at an excessive rate of speed on January 18 can scarcely be considered evidence of flight. For Ruggiero nowhere suggested that the two men knew that they were being followed, as the defendants in United States v. Christophe, supra, surely did.

suspicion is not enough for an officer to lay hands on a citizen. It is better, so the Fourth Amendment teaches, that the guilty sometimes go free than that citizens be subject to easy arrest." 361 U. S. at 104, 80 S.Ct. at 172.

### III.

██ Even though the agents lacked probable cause to arrest Torres, the question remains whether their search was justified under § 140.50 of the New York Criminal Procedure Law, the so-called "stop and frisk" law.[7] It is now generally acknowledged that an investigative stop and frisk can be justified by a far lower quantum of "suspicion" than is required to justify an arrest. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Adams v. Williams, 407 U. S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Quite apart from the foregoing, I conclude that although § 140.50 would have permitted the stop and limited questioning of Torres, it could not have justified the search that was conducted of the bag he carried.

The plain language of the statute would appear to preclude the conduct of the agents here. Paragraph 1 permits an officer, when he reasonably suspects the commission of a crime, to stop the suspect and "demand of him his name, address and an explanation of his conduct." A search is authorized by the terms of Paragraph 2 *only* when "a po-

lice officer reasonably suspects that he is in danger of physical injury."

██ The New York statute accurately expresses the sense of the Supreme Court decisions in Sibron and Terry, supra, that a frisk is only justified by an officer's regard for his personal safety, not by his interest in discovering contraband. A police officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron, supra, 392 U.S. at 64, 88 S.Ct. at 1903. However, "the officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, supra, 392 U.S. at 27, 88 S.Ct. at 1883. See also People v. Peters, 18 N. Y.2d 238, 273 N.Y.S.2d 217, 219 N.E.2d 595 (1966); United States v. Davis, 441 F.2d 28 (9th Cir. 1971). Mention should also be made of the observation of Judge Friendly, dissenting, in Williams v. Adams, 436 F.2d 30 (2nd Cir. 1970) at p. 38: "I have the gravest hesitancy in extending Terry to crimes like the possession of narcotics (citation omitted). There is too much danger that, instead of the stop being the object and the protective frisk an incident thereto, the reverse will be true." 436 F.2d at 38. His prescient statement seems peculiarly applicable to the matter before me.

██ Even assuming that some form of frisk was justified under these cir-

---

7. N.Y. Criminal Procedure Law § 140.50:

"§ 140.50 Temporary questioning of persons in public places; search for weapons

1. In addition to the authority provided by this article for making an arrest without a warrant, a police officer may stop a person in a public place located within the geographical area of such officer's employment when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a class A misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct.

2. When upon stopping a person under circumstances prescribed in subdivision one a police officer reasonably suspects that he is in danger of physical injury, he may search such person for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. If he finds such a weapon or instrument, or any other property possession of which he reasonably believes may constitute the commission of a crime, he may take it and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."

cumstances—and I make no such finding —the search here exceeded in scope that which is authorized in *Terry*. The Court there approved only a limited patting of the outer clothing of a suspect for concealed objects which might be used as instruments of assault. It emphasized that such a frisk was in no way comparable to a search incident to a lawful arrest, which can be justified by the need to prevent the destruction of evidence. The lower courts have interpreted *Terry* to mean that searches conducted pursuant to stop and frisk laws must be severely circumscribed, and have not hesitated to declare illegal searches that extended the limited interest in protection into a full blown search for evidence. See, e. g., Tinney v. Wilson, 408 F.2d 912 (9th Cir. 1969); United States v. Del Toro, 464 F.2d 520 (2nd Cir. 1972).

The New York "stop and frisk" law, in short, can provide no conceivable justification for the search conducted here. None of the agents who testified expressed any concern that Torres might be armed and dangerous, and it is evident, even from their own testimony, that they grabbed his paper bag because they hoped to find narcotics, not a weapon.

### IV.

Because the agents lacked probable cause to arrest Torres, it follows that all of Torres' subsequent statements to the agents and prosecutors were tainted by this basic violation of his Fourth Amendment rights. The statements are thus "fruit of the poisonous tree" and must be suppressed under the reasoning of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). See also, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1921).

In conclusion, defendant's motion to suppress the $100,000 seized at the time of his arrest as well as his subsequent statements is granted in its entirety.

It is so ordered.