**UNITED STATES of America,**

v.

**Jose Pablo MANGERI, Defendant.**

No. 77 Cr. 868.

United States District Court,
S. D. New York.

March 22, 1978.

74

Robert B. Fiske, Jr., U. S. Atty. by Henry Korn, Asst. U. S. Atty., New York City, for plaintiff.

Ivan Fisher, New York City, for defendant.

## MEMORANDUM DECISION

STEWART, District Judge:

Defendant Jose Pablo Mangeri moves to suppress evidence seized from his apartment[1] on the morning of November 28, 1977. In October, 1977, an arrest warrant had been issued for the defendant in the Southern District of Florida, based on a complaint charging the defendant with involvement in a narcotics conspiracy. Shortly after the warrant was issued, Drug Enforcement Administration agents in Florida contacted agents in New York and asked them to locate Mangeri and to arrest him. The agents discovered that Mangeri was living at the York Avenue apartment with his fiancee, Lynne Hochberg.

On the morning of November 28, 1977, three agents, Brogan, Mella and Fillmore met at the apartment building. After checking with the management and seeing a layout of the apartment, the agents proceeded to the 37th floor.[2] Fortuitously, as the agents were getting out of the elevator, another woman also got out who they realized was about to enter apartment 37C. The woman was the defendant's maid, who had previously been announced by the doorman to the occupants of the apartment. The agents quickly decided to enter the apartment behind the maid, and agreed that Brogan and Fillmore would arrest the

defendant while Mella would search the apartment. Lynne Hochberg opened the door for the maid, and the three agents entered behind the maid with their guns drawn. The agents could see the defendant the moment they entered the apartment, as he was lying on a sofa bed in the living room. The defendant immediately surrendered to the agents.

There were several other people congregated in the living room at the time of the agents' entry—the defendant's parents, his sister Monica, and Monica's 7-year old daughter. All the occupants were in pajamas or nightgowns. Agents Brogan and Fillmore arrested and handcuffed the defendant and searched him, while Mella placed the other people on or around the bed, which was located in the front of the living room (toward the gallery).[3] Agent Mella did not search the other individuals, since

> The clothing that they were wearing was nightclothes, and I didn't see any bulges, and it would have been easy for me to detect it, being that they were wearing the nightclothes, which are of a looser— of a filmsy kind of material or thin material that would disclose any kind of a bulge. Tr. at 123.

Since the defendant was in nightclothes, agents Brogan and Fillmore escorted the defendant into the bedroom[4] (by walking through the gallery, not the dining room) so that he could get dressed.[5] Hochberg followed them into the bedroom. Agent Mella remained in the living room with the defendant's parents, sister and niece. Several minutes after entering the apartment, Mella made a cursory search of the apartment for security purposes. Agent Mella testi-

---

1. Apartment 37C at 1365 York Avenue, New York, New York.

2. A fourth agent Reape, remained outside the building.

3. At H1 on the map attached as Exhibit A to this opinion.

4. There is a discrepancy between the agents testimony as to whether the defendant was given his rights in the living room or the bed-

room. It is not necessary to resolve this question for the purposes of the instant motion.

5. Defendant has not contested that the agents had a right to follow him into the bedroom to watch him while he got dressed. *United States v. DiStefano*, 555 F.2d 1094, 1101 (2d Cir. 1977).

fied that such a search is routinely made by agents making an arrest in a dwelling place. He testified:

> The nature of the training was that any-time that an agent or agents have [sic] any kind of law enforcement agency were to make an arrest in a dwelling place, the premises would always have to be secured.
>
> Now, what I mean by "secured" is that at least one agent, possibly two, if available, would search the area of the dwelling place for individuals who might be hiding or secreted in any area of the dwelling place.
>
> The reason for this search to secure the apartment or dwelling is that the agents have the responsibility of their safety and the safety of the individual that they had just arrested.

\* \* \* \* \* \*

> With me, it's almost a kind of thing where I do it religiously because it is—I am doing it for my own personal safety and that of my brother agents, so its something you won't forget to do. It's something that you do when it's—it's a conditioned kind of thing. Tr. 116–118. (See also pp. 165–169).

Agent Mella left the defendant's parents, sister and niece alone in the living room when he went to search the apartment.

> I felt relatively secure in leaving them unattended at that time because I either had to stay there and attend them or neglect my search of the rest of the apartment for security purposes, and the fact that they were women and an elderly man and a young child, I felt relatively secure leaving them unattended for a few moments. Tr. 204.

Agent Mella them walked out of the living room and into the dining room. He stated that he first was looking to his left (toward the windows) and then as he head-ed toward the door between the dining room and the kitchen he noticed that the dining room closet door was open.[6] He alleges that in plain view he noticed on a shelf in the closet a safe whose door was open. Through the open door of the safe he alleges that he saw the cocaine and money at issue in this suppression motion.

Much of the testimony at the hearing was devoted to whether or not the closet door was open or closed, whether the safe door was open or closed—whether or not the evidence was in plain view.[6a] However before the plain view doctrine can be invoked, ". . . the police officer . . . [must have] . . . a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the. warrantless seizure." *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

The defendant has not contested the fact that the agents' entry into the apartment, and the arrest of the defendant (based on the Florida arrest warrant), were lawful. The first issue the Court must resolve then, is whether or not agent Mella was entitled to make a cursory security search of the apartment. For if the Court finds that he was not entitled to make such a search in the dining room, then the evidence must be suppressed whether or not it was in plain view once Agent Mella entered the dining room.

As the Courts have reiterated numerous times, "the most basic constitutional rule . . . is that 'searches conducted

---

**6.** Point 1 on Exhibit A.

**6a.** Because of our holding, *infra*, we do not reach the issue of whether or not the evidence was in fact in plain view.

outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' " *Coolidge v. New Hampshire, supra,* 403 U.S. at 454–55, 91 S.Ct. at 2032 (citations omitted).

The government has argued that Mella's search of the dining room was lawful because it was a search incident to a lawful arrest, and because "it is proper for an arresting agent to conduct a cursory examination of the premises to insure that other people are not present in the apartment who might pose a danger to the agents and the defendant." *Government's Memorandum in Opposition to Motion to Suppress Evidence,* at 35.

■ Under the law enunciated in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and *United States v. Mapp,* 476 F.2d 67 (2d Cir. 1973), the search of the dining room cannot be justified as one incident to a lawful arrest. In *Chimel* the Supreme Court held,

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. . . . There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. *Chimel v. California, supra,* 395 U.S. at 762–63, 89 S.Ct. at 204.

The defendant Mangeri was arrested at the end of the living room near the gallery, not near the entrance to the dining room. The dining room was not an area within his immediate control from which he could obtain weapons and/or evidentiary items.[7] And while one might argue that the search in *Chimel* was a search of an entire house while the search of the Mangeri dining room was similar to the search of a single room,[8] the Court in *Chimel* expressly declined to distinguish between single room searches and more extensive searches, finding that such distinctions would be "highly artificial." "The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other." *Chimel v. California, supra,* 395 U.S. at 766, 89 S.Ct. at 2042. *United States v. Mapp, supra.*

■ The law is less clear on whether or not agents who have made an arrest may conduct a cursory examination of the entire premises for security purposes. It appears that unless there are exigent circumstances which would cause the law enforcement agents to believe that they are in danger, cursory security searches of the premises

---

7. Since the rest of the family congregated around the sofa bed, the dining room was not a place from which they could obtain weapons or evidentiary items either.

8. The dining room of the Mangeri apartment was connected to the living room by a wide door. While the government argued that the living room and dining room could be considered one big room, we believe the dining room must be considered a separate area, and certainly it was not an area "within the immediate control" of the defendant or of the others in the apartment.

are not sanctioned under the Fourth Amendment.

In *United States v. Bravo,* 403 F.Supp. 297, 302–3 (S.D.N.Y.1975), *aff'd in part and rev'd in part sub nom. United States v. Armedo-Sarmiento,* 545 F.2d 785 (2d Cir. 1976), the District Court stated:

> It is the government's position that a cursory inspection of the premises during the course of this arrest was necessary to determine whether other persons who might thwart the arrest, present a threat to . . . [the agents] . . . or escape the premises were present. Although there are circumstances which justify law enforcement personnel in conducting such a search concurrent with an arrest, no such circumstances were present here. . . . Most importantly, however, neither . . . [of the agents] . . . had knowledge of any facts which would indicate that there were others in the apartment or that they themselves were in danger. The only justification advanced for the investigation was the departmental practice of searching all rooms of a residence for other persons upon completion of an arrest. This is not sufficient justification

of the instant search. Where no circumstances exist indicating that there may be, concealed in an apartment, persons who might present a danger to police officials, the fourth amendment does not allow a search such as the one conducted herein [footnotes omitted].

While a statement in *United States v. Christophe,* 470 F.2d 865 (2d Cir. 1972) that agents ". . . were entitled to conduct a cursory examination of the premises to see if anyone else was present who might threaten their safety or destroy evidence" casts some doubt on the *Bravo* holding, the statement in *Christophe* is *dictum,*[9] and the Court of Appeals in its review of the *Bravo* holding did not cite its earlier statement in *Christophe* (and it appears to be affirming the District Court's holding on this point).[10] *United States v. Armedo-Sarmiento, supra,* 545 F.2d at 796.

Thus unless there are exigent circumstances which would reasonably indicate to the agents that they may be in danger or that there are others in the apartment who may be destroying evidence, there is no exception to the warrant requirement of the Fourth Amendment for cursory security

**9.** In *Christophe,* the agents did not find anything in their cursory security examination of the premises. The heroin in question was not discovered until a later search was conducted after a search warrant had been obtained.

**10.** In *Bravo,* police officers visited the defendants' apartment in connection with an unrelated investigation. After seeing some partially smoked marijuana cigarettes and some money on a table, they arrested the defendants. Then, one of the officers proceeded to walk through the apartment for a cursory security search. While walking down a hallway the officer saw in plain view two shopping bags containing bricks of marijuana and white powder. After he saw the shopping bags, the defendants attempted to bribe the officers. The observed contents of the shopping bags were used as a basis for obtaining a subsequent search warrant. The contents of the bags were not actually seized until after the search warrant was obtained.

The District Court found that the cursory search of the apartment was unjustified under the Fourth Amendment since there were no exigent circumstances which could have caused the officers to believe that they were in danger. However, the Court did not suppress

the evidence since it found that the affidavit for the search warrant contained sufficient probable cause for issuance of the warrant without consideration of the tainted evidence.

The Court of Appeals reversed the District Court's finding that there was sufficient untainted evidence on which to base the issuance of the warrant, and thus suppressed the evidence found at the apartment. While the Court did not explicitly affirm the District Court's finding that cursory security searches are not justified under the Fourth Amendment absent exigent circumstances, the Court did state that the command in the warrant to seize the two shopping bags "could have resulted only from their observation by the police officers during their *unlawful search*". *United States v. Armedo-Sarmiento, supra,* at 796 (emphasis added). Thus it seems clear to us that the Court of Appeals upheld the District Court's finding that such cursory security searches violate the Fourth Amendment, otherwise, there would have been no need for it to reach the issue of whether there was sufficient evidence from "untainted" independent sources to justify the issuance of the search warrant.

searches. While the Second Circuit Court of Appeals cases have not discussed what "exigent" circumstances would allow such a search, several cases in other circuits are helpful on this point. "Exigent" circumstances to justify such security searches have been upheld, for example, where the agents have information that the individual arrested is travelling with other armed accomplices, where the agents have reason to believe other suspects were in the apartment, where the agents have broken down the door after being refused admittance and have heard scurrying in the background or flushing of toilets, or where they have seen evidence being destroyed. *United States v. Gamble,* 473 F.2d 1274 (7th Cir. 1973); *United States v. Sellers,* 520 F.2d 1281 (4th Cir. 1975); *United States v. Smith,* 515 F.2d 1028 (5th Cir. 1971); *United States v. Blake,* 484 F.2d 50 (8th Cir. 1973); *United States v. Clemons,* 503 F.2d 486 (8th Cir. 1974). (While the Second Circuit has not discussed "exigent" circumstances, in *United States v. DiStefano,* 555 F.2d 1094, 1101 (2d Cir. 1977), the court upheld the agents' entry into the bedroom because ". . . the officers' entry into the bedroom was solely for the purpose of maintaining control over . . . [the defendant] . . . while she dressed.")

■ At the time the agents arrested Mangeri, there were no exigent circumstances which would justify a cursory security search of the rest of the apartment. The only information which the agents possessed at the time they entered the apartment which could justifiably cause them any concern, was a report that the defendant had a prior gun charge (and thus might be armed and dangerous).[11] However, since they walked into the apartment unannounced and immediately arrested, handcuffed, and searched the defendant who was in bed in pajamas, Mangeri could no longer pose any danger to the agents. The agents had *no* information that the defendant was with any accomplices, much less an armed accomplice (Tr. 104). While there were other people in the living room with the defendant, the agents did not feel threatened by any of them, and in fact agent Mella left them alone when he went to search the apartment (Tr. 204). The agents did not hear any scurrying or other noises which would indicate that there might be additional people in the apartment.

■ Thus, the only justification for agent Mella's search was the agents' statements that such security searches are "standard operating procedure" (Tr. 71, 165–68). There were no circumstances, exigent or otherwise, which could reasonably have caused the agents entering the Mangeri apartment to believe they were in danger. Since there were no exigent circumstances, and since the law apparently does not sanction such cursory security searches without existent circumstances, the agents' seizure of evidence in the dining room during the search, even if in plain view (which we do not decide), was prohibited by the Fourth Amendment. Accordingly, the evidence found in the safe in the dining room is suppressed, and since this evidence was used to obtain a subsequent search warrant of the apartment, any additional evidence found as a result of the later search is suppressed also.

SO ORDERED.

---

11. It involved a BB gun, although the agents testified that they did not know the details of the charge (only that there had been a prior gun charge).