THE STATE OF OHIO, APPELLEE, *v.* SMITH, APPELLANT.

[Cite as State *v.* Smith (1989), 45 Ohio St. 3d 255.]

(No. 88-826—Submitted April 12, 1989—Decided September 13, 1989.)

*Robert P. DeSanto,* prosecuting attorney, and *Ramona J. Rogers,* for appellee.

*Stephen Cockley* and *David Homer,* for appellant.

HOLMES, J. The issue presented in this case is whether the search and seizure of appellant's bag was reasonable within the Fourth Amendment to the United States Constitution, and Section 14, Article I of the Ohio Constitution, which mirrors that amendment. For the reasons which follow, we answer such query in the affirmative, and thus affirm the court of appeals.

Three events occurred in this case which must be analyzed in light of the Fourth Amendment: (1) the encounter between appellant and Officer Thomas, (2) Thomas' seizure of the brown paper bag, and (3) Thomas' search of that bag.

## I

No "seizure" of the person of appellant occurred in this case, prior to the discovery of the contraband and appellant's subsequent arrest. It is well established that "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry* v. *Ohio* (1968), 392 U.S. 1, 19, at fn. 16. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Id.* at 34 (White, J., concurring). In *United States* v. *Mendenhall* (1980), 446 U.S. 544, the court reaffirmed its position, taken in *Terry, supra,* and *Sibron* v. *New York* (1968), 392 U.S. 40, and detailed the degree of restraint necessary to invoke constitutional safeguards:

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. [Footnote omitted.] Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall, supra,* at 554.

The court made it clear that "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.* It is *not enough* "to establish a seizure that the person asking the question was a law enforcement official," *id.* at 555, nor does it matter that the person is not expressly told by the official that he is free to decline to answer questions. *Id.* In *Florida* v. *Royer* (1983), 460 U.S. 491, a plurality of the court, seven Justices, reaffirmed these principles as to when a seizure occurs. *Id.* at 497-498, 523. See, also, *Immigration & Naturalization Service* v. *Delgado* (1984), 466 U.S. 210, 215-217.

In *Mendenhall,* the respondent, Sylvia Mendenhall, was observed by two federal Drug Enforcement Administration ("DEA") agents as she arrived at the Detroit Metropolitan

Airport on a flight from Los Angeles. Mendenhall's behavior appeared to the agents to fit a "drug courier profile," so the agents approached her, identified themselves as federal agents and asked to see her identification and airline ticket, which she produced. Mendenhall answered further questions posed by the agents, and after the agents identified themselves as federal narcotic agents, Mendenhall became visibly nervous. The DEA agents returned her identification and ticket to her, and asked her to accompany them to the airport DEA office. Mendenhall complied and later consented to a search of her person and her handbag. Mendenhall removed two small packages from her undergarments, one of which contained heroin, and she was *then* arrested for possession of heroin. *Id.* at 547-549. In upholding the denial of Mendenhall's motion to suppress, Justice Stewart reviewed these facts and stated: "[N]othing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure."[1] *Id.* at 555. The court also held that Mendenhall voluntarily consented to accompany the agents to the DEA office, *id.* at 558, and she freely and voluntarily consented to the search of her person, *id.* at 559-560.

Having set forth these rather simple concepts of when a "seizure" within the meaning of the Fourth Amendment occurs, a review of the facts in this case reveals that, as in *Mendenhall,* a reasonable person in appellant's position would have believed he was free to leave at any time, prior to his actual arrest following the discovery of contraband. Officers Thomas and Edwards, with combined law enforcement experience of over fifteen years, observed appellant and his companion emerge from the Balducci residence and, for reasons discussed in Part II, *infra,* became suspicious of

---

[1] Then Justice Rehnquist joined in this conclusion. The Chief Justice and Justices Powell and Blackmun concurred in the judgment, but felt it was not proper to reach the issue of whether the initial stop by the agents constituted a seizure within the meaning of the Fourth Amendment, since neither of the lower courts had considered the question. The concurring Justices assumed, however, that the stop constituted a seizure, and concluded that it was a reasonable investigative stop not offensive to the Fourth Amendment. Justice Powell, writing for the concurring Justices, concluded:

"* * * The public interest in preventing drug traffic is great, and the intrusion upon respondent's privacy was minimal. The specially trained agents acted pursuant to a well-planned, and effective, federal law enforcement program. They observed respondent engaging in conduct that they reasonably associated with criminal activity. Furthermore, the events occurred in an airport known to be frequented by drug couriers. [Footnote omitted.] In light of all of the circumstances, I would hold that the agents possessed reasonable and articulable suspicion of criminal activity when they stopped the respondent in a public place and asked her for identification.

"The jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures. *In applying a test of 'reasonableness,' courts need not ignore the considerable expertise that law enforcement officials have gained from their special training and experience.*" (Emphasis added.) *Mendenhall, supra,* at 565-566. See, also, Part II, *infra.*

their behavior as they entered the YMCA parking lot. The plain-clothes officers, in their unmarked cruiser, pulled up behind the car appellant was approaching and Thomas asked appellant what was in his bag. Appellant did not answer. Thomas got out of the car and said, "hey, come here a minute" to appellant, who looked over his shoulder and kept walking towards the car. Thomas then verbally identified himself as a police officer. The appellant turned towards Thomas, threw the brown paper bag onto the hood of the car and stepped back from the car.[2]

Only these two officers, in plain clothes, were present (Edwards had radioed their location and was approaching appellant's companion as Thomas approached appellant). Neither officer displayed his weapon, nor had Thomas physically touched appellant at that time. Thomas, who was the only person to speak, at no time used a threatening tone of voice, did not order

appellant into the cruiser at any time, and never stated or indicated anything to the effect that if appellant did not come toward the officer he would be under arrest.

Thus, none of the examples indicating a seizure enumerated in *Mendenhall, supra,* at 554, was present in this case, nor are any other circumstances present such that "a reasonable person would have believed that he was not free to leave." *Id.* In fact, appellant testified at the suppression hearing that he did not feel compelled to go towards Thomas when he identified himself as a police officer, and corroborated the facts that he had not been spoken to harshly or threatened with arrest, no weapon had been displayed to him, and he stated that the officers' cruiser was not blocking his exit from the YMCA parking lot.

The facts presented in this case are indistinguishable from those presented in *Mendenhall,* and we decline to adopt

---

[2] Both officers testified at the suppression hearing that appellant *threw* the bag onto the hood of the car. Appellant's own testimony was contradictory. On direct examination, the appellant stated:

"Q. And then what happened next?

"A. He asked me again, and then he said he was a police officer, and by then, I put the bag on top the hood of the car.

"Q. Did you throw the bag?

"A. I didn't exactly throw it. I sort of set it up there.

"Q. And then what did you do?

"A. Walked back towards him, which by then, he was about like three, four feet from me."

On cross-examination, the following exchange took place:

"Q. Isn't it a fact that you threw the bag on the trunk to attempt to disassociate yourself with [*sic*] the cocaine?

"A. No, not really. I didn't throw it on the trunk. I threw it on the hood.

"Q. If you threw it on the hood, isn't it a fact that you threw it on the hood to disassociate yourself from what you knew was cocaine in that bag?

"A. No.

"Q. Why did you throw it on the hood?

"A. I just sat [*sic*] it up there to go see what he wanted."

The trial court, in its findings of fact, specifically found that "[w]hen Sgt. Thomas identified himself as a police officer, the Defendant threw the brown grocery bag away from himself and onto the hood of his car and stepped backwards away from the bag * * *." It is axiomatic that "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, 39 O.O. 2d 366, 227 N.E. 2d 212, paragraph one of the syllabus.

appellant's theory that any encounter between a citizen and the police, once the law enforcement officer has identified himself and asks a question of the citizen, constitutes a "seizure" within the Fourth Amendment.

"* * * [C]haracterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes* v. *Washington,* 373 U.S. 503, 515.' " *Schneckloth* v. *Bustamonte* (1973), 412 U.S. 218, at 225, quoted in *Mendenhall, supra,* at 554.[3] No seizure of appellant's person, within the meaning of the Fourth Amendment, occurred in this case.

## II

Of course, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, *and effects,* against unreasonable searches and seizures." (Emphasis added.) In general, a seizure of personal property, such as the bag carried by appellant here, is considered *per se* unreasonable within the Fourth Amendment unless it follows from a judicial warrant issued upon probable cause and particularly describing the item to be seized. See *Marron* v. *United States* (1927), 275 U.S. 192, 196. Absent a warrant, but where law enforcement officials have probable cause to believe that a container, such as appellant's bag, holds contraband or evidence of a crime, the item may be seized—pending issuance of a warrant to search—"if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States* v. *Place* (1983), 462 U.S. 696, 701.

In *Place,* however, the United States Supreme Court went a step further and recognized as reasonable under the Fourth Amendment the temporary, warrantless seizure of personal property (luggage, in that case) in an intermediate, *Terry*-type situation, *i.e.,* a seizure on the basis of reasonable, articulable suspicion, premised on objective facts, that such property contains contraband or

---

[3] Consider the following observations from *Terry* v. *Ohio, supra,* at 13-15:

"The exclusionary rule has its limitations, however, as a tool of judicial control. It cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections. Moreover, in some contexts the rule is ineffective as a deterrent. Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. * * * Doubtless some police 'field interrogation' conduct violates the Fourth Amendment. But a stern refusal by this Court to condone such activity does not necessarily render it responsive to the exclusionary rule. * * *

"* * * [A] rigid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime. * * *"

evidence of a crime. *Place, supra,* at 702. The court recognized that the "articulable suspicion" exception to the probable-cause requirement recognized in *Terry* and its progeny rests on the balance of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 703. Noting that " '[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit,' " *id.,* quoting *Mendenhall, supra,* at 561 (Powell, J.), and that "seizures of property can vary in intrusiveness," *id.* at 706, the *Place* court opined that "some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that [such] strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *Id.* at 706.

As the court explained in *United States* v. *Cortez* (1981), 449 U.S. 411, 417-418:

"Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—*the whole picture*—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. * * *

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, *the assessment must be based upon all of the circumstances.* The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—*inferences and deductions that might well elude an untrained person.*

"*The process does not deal with hard certainties, but with probabilities.* Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. *Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.*

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. * * *" (Emphasis added.) See, also, *United States* v. *Jacobsen* (1984), 466 U.S. 109, 121-122.

Applying these rudiments of Fourth Amendment jurisprudence to the facts of this case, it is evident that Officer Thomas, far from having the inarticulate hunch perceived by appellant, possessed sufficient objective facts to support a particularized articulable suspicion that the bag carried by appellant contained contraband.

During the suppression hearing, both officers testified as to their prior law enforcement experience, including

drug arrests by Thomas and the circumstances they observed prior to seizing appellant's bag. While preparing to go on a gambling raid, they observed appellant and his companion emerge from the home of Wilma Balducci, who the officers knew to be a convicted felon (for forgery) out on probation. The officers also knew that approximately six months prior to that time the Ashland County Sheriff's Department had executed a warrant to search the Balducci residence and that drug paraphernalia had been found as a result of such search. In addition, Thomas testified that he had received recent tips from informants that Balducci had been dealing in drugs, and neighbors of Balducci had complained of heavy traffic in and out of her residence. Officer Edwards testified that he had spoken to a witness in an earlier investigation who stated Balducci had purchased property in exchange for cash and drugs.

Coupled with these suspicions regarding the Balducci residence, the officers observed appellant carrying the closed grocery bag down at his side, keeping it level and, as testified by Edwards, appellant "was walking kind of gingerly with it." Thomas testified to several prior investigations and arrests in which the suspects carried drugs or narcotics in this fashion. Finally, as the officers approached to investigate, appellant abruptly disassociated himself from the bag as he, with a mumbled curse, threw the bag onto the hood of the car and backed away from it. Obviously, none of these observations, *standing alone,* would give rise to an articulable suspicion that the bag contained contraband. It was the culmination of all these observations which led Thomas to reasonably believe that appellant's bag contained narcotics,[4] and thus he was permitted, under the principles of *Terry* and its progeny, to detain the bag briefly to investigate further the circumstances that aroused his suspicion. See *Place, supra,* at 706. "Indeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.' 392 U.S., at 22 * * *." *United States* v. *Sokolow* (1989), 490 U.S. ___, 104 L. Ed. 2d 1, 12, 109 S. Ct. 1581, 1587.

In *Sokolow,* decided just five months ago by a compelling seven-to-two majority, the court held that DEA agents had a reasonable suspicion that Sokolow was transporting illegal drugs when they stopped him at Honolulu Airport, based on the agent's belief that Sokolow's behavior was consistent with one of the DEA's "drug courier profiles."[5] The court noted, *id.* at ___, 104 L. Ed. 2d at 11, 109 S. Ct.

---

[4] In *United States* v. *Mendenhall, supra,* at 563–564, Justice Powell, in the plurality opinion, observed:

"* * * [I]t is important to recall that a trained law enforcement agent may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' * * * Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices. *Law enforcement officers may rely on the 'characteristics of the area' and the behavior of a suspect who appears to be evading police contact. United States* v. *Brignoni-Ponce,* 422 U.S. 873, 884–885. 'In all situations the officer is entitled to assess the facts in light of his experience.' *Id.,* at 885." (Emphasis added.) See, also, *State* v. *Bobo* (1988), 37 Ohio St. 3d 177, 179–180, 524 N.E. 2d 489, 492.

[5] "When respondent was stopped, the agents knew, *inter alia,* that (1) he paid $2,100 for two airplane tickets from a roll

at 1586, that "[a]ny one of these [profile] factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think *taken together* they amount to reasonable suspicion." (Emphasis added.)

The officers' suspicions here were clearly articulated at the suppression hearing, and were supported by objective facts. Thus, the seizure of appellant's bag was reasonable under the Fourth Amendment.

### III

Finally, we conclude that the search of appellant's bag contemporaneous with his arrest was justified by the need to prevent the destruction of evidence of the crime.[6] In *United States* v. *Chadwick* (1977), 433 U.S. 1, 14-15, the court detailed the justifications for searches "incident to [an] arrest":

"* * * When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, *and to prevent the loss of evidence,* it has been held reasonable for the arresting officer to conduct a prompt, warrantless 'search of the arrestee's person and the area

"within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Chimel* v. *California* [1969], 395 U.S. [752], 763 * * *.

"Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. *United States* v. *Robinson,* 414 U.S. 218 (1973); *Terry* v. *Ohio, supra.* However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' *Preston* v. *United States,* 376 U.S. [364], at 367, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their *exclusive control,* and

---

of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage." *Sokolow, supra,* at ____, 104 L. Ed. 2d at 7-8, 109 S. Ct. at 1583.

[6] We do not adhere to the view taken by the lower courts to the effect that appellant had "abandoned" the bag when he threw it on the car and thus no longer retained any reasonable expectation of privacy with

regard to it. Appellant was, at most, only two steps away from the bag at any time, and the evidence presented at the suppression hearing is clear that appellant physically attempted to prevent Officer Thomas from seizing the bag. Thus, in our view, appellant had not " 'voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a *reasonable* expectation of privacy' with regard to it at the time of the search.' " (Emphasis added.) *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 297, 18 O.O. 3d 472, 476, 414 N.E. 2d 1044, 1048, quoting *United States* v. *Colbert* (C.A. 5, 1973), 474 F. 2d 174, 176.

there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." (Emphasis added.) See, also, *Terry, supra.*

The court in *Chimel* v. *California, supra,* at 763, was straightforward:

"* * * [I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. * * * There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

The search here was neither remote in time nor place from appellant's arrest. Furthermore, the bag was still within appellant's easy reach. Although Thomas lawfully seized the bag, he had not—at the time appellant reached out in attempt to prevent such seizure—reduced the bag to his "exclusive control." The danger of appellant obtaining the bag and destroying all or part of its contents was still present, and thus the search was warranted.

For all of the foregoing reasons, we affirm the judgment of the court of appeals, upholding the denial of appellant's motion to suppress.

*Judgment affirmed.*

MOYER, C.J., and RESNICK, J., concur.

DOUGLAS, J., concurs in judgment.

SWEENEY, WRIGHT and H. BROWN, JJ., dissent.

DOUGLAS, J., concurring in judgment. While I concur in the judgment of the majority, I write separately to express my great concern with the concept of the majority that a person, stopped by police officers who have identified themselves as such, is "* * * free to leave at any time, prior to his actual arrest * * *." The majority, somewhat naively I think, indicates that appellant was free to ignore the officers' commands because the officers did not display their weapons, did not physically touch appellant, and did not use a threatening tone of voice or order appellant into the cruiser.

Under the majority's scenario on this point, one can only wonder what action the officers would have taken and what would have happened to appellant had he continued to keep control of his sack and proceeded to run from the officers and the vicinity. Is it not reasonable to assume that there would have been other charges, such as a resisting arrest charge?

My point in writing is that I do not believe the highest court of this state should be saying in writing that citizens are free to ignore the orders of police officers just because the officer has not taken one of the actions described in the majority opinion. For us to give judicial approval to this is naive at best—and could be disastrous at worst. It will be interesting to see how we will rule when next we get a case where a citizen ignores a police officer's directions, runs or walks away, and then is pursued and apprehended with contraband.

Result-oriented jurisprudence should be avoided even when it appears to be the "right" thing to do.

SWEENEY, J., dissenting. By its

opinion today, the majority has not only misconstrued the precedents it cites to supposedly support its untenable ruling, but it has ignored the clear language of the federal and state guarantees of freedom from unreasonable or unlawful warrantless searches and seizures as embodied in the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution (hereinafter collectively referred to as the "Fourth Amendment"). Accordingly, I must strongly dissent from the decision rendered in this case.

The majority's tortuous path used to arrive at what appears to be a predetermined result is filled with misinterpretations of the state of the law as announced by the United States Supreme Court concerning the validity of any particular search and seizure.

The majority's first point, *i.e.,* that the appellant was not "seized" by Officer Thomas, seems to be based more on wishful thinking than on coherent constitutional analysis. The majority relies heavily on *United States* v. *Mendenhall* (1980), 446 U.S. 544, for the proposition that the instant appellant was not "seized" by the police. However a careful review of *Mendenhall* compels an opposite conclusion. In *Mendenhall, supra,* the Supreme Court developed what can be characterized as a "reasonable person" standard to determine whether a seizure has taken place under a particular set of facts. The court therein held that a seizure of the person could only occur when, in view of all circumstances, a reasonable person would believe that he or she was not free to leave. *Id.* at 554. In *Mendenhall,* the facts indicate that defendant was stopped by federal agents on an airport concourse and was asked to show some identification. Eventually, defendant consented to a search which led to a discovery of nar-

cotics on her person and she was arrested. The court in *Mendenhall* opined that a reasonable person in defendant's position would have felt free to leave under the circumstances. *Id.* at 555.

In contrast, it is clear that under the circumstances, the appellant herein could only reasonably believe that he was not free to leave when requested to stop by the officer. After Officer Thomas requested appellant to stop, he quickly and forcibly seized the appellant's personal property (the paper grocery bag and its contents). Under such circumstances, there is no logical basis for holding that a reasonable person in appellant's position was free to leave. The non-consensual seizure of appellant's property is the aspect which clearly distinguishes the instant cause from *Mendenhall, supra.* In *Mendenhall,* the defendant's property was not seized until after she had consented to a search; whereas, here, the appellant never had time to consent to a search or to answer any pertinent questions. While Officer Thomas did identify himself as a police officer, his hasty seizure of appellant's grocery bag was done in total disregard of appellant's rights under the Fourth Amendment, because such a seizure of personal property by the officer effectively removed from appellant his freedom to leave, inasmuch as appellant had exerted a privacy and possessory interest in the contents of the grocery bag.

The majority, in a fallacious attempt to justify the officer's action, has completely misapplied the rule of law in *Mendenhall.* Of crucial relevance to the instant cause is the fact that the appellant's property was seized and searched *prior to his arrest.* In *Mendenhall,* however, there was a consent to a search which led to an arrest. To say that the appellant here was free

to leave even after the officer had seized his personal property is absurd, and *Mendenhall, supra,* does not support such a conclusion.

Even if it were to be assumed that appellant was not "seized" for the purposes of the Fourth Amendment, it is clear that he was at least unlawfully detained. In *Brown* v. *Texas* (1979), 443 U.S. 47, the high court recognized that a police officer may briefly detain a suspect even though the officer does not have probable cause to believe that the suspect is involved in criminal activity. However, the court in *Brown* stated that the officer must at least have a reasonable suspicion, based on objective facts, that the person being detained is involved in criminal activity. *Id.* at 51. While the rule of law in *Brown* may be characterized as lenient, its application to the instant factual situation compels a finding that the detention of appellant was in clear violation of his Fourth Amendment rights.

First of all, the officers here apparently relied on unsubstantiated reports that the house from which appellant had left was a "drug house." Second, Officer Edwards implied that since appellant was carrying the paper bag "gingerly," he suspected that appellant was carrying drugs. In my view, such reasoning is not by any means an objective view of the facts. There are countless items that one may put in a grocery bag that must be carried "gingerly." Hence, it seems clear that the officers had no reasonable suspicion that appellant was involved in criminal activity of a type that would justify the detention of appellant that occurred here.

Even assuming, *arguendo,* that the officers were justified in detaining appellant, the seizure and search of appellant's bag was clearly and unmistakably undertaken in violation of his Fourth Amendment rights. The majority's "analysis" of the search and seizure has the ultimate effect of disposing of appellant's Fourth Amendment freedoms in their entirety. While the majority cites many cases that purportedly justify a seizure of personal property, closer scrutiny reveals that none of the cited cases even remotely justifies what was done in the case at bar. In fact, I challenge the majority to name one United States Supreme Court case that permits an officer to conduct a search of personal property without a warrant, and then arrest the person based on the fruits of the warrantless/illegal search. Of course, no holding based on facts similar to the instant cause has been upheld by the United States Supreme Court because such a holding would totally fly in the face of the precise language of the Fourth Amendment.

Under the Fourth Amendment, a search and seizure of personal property is almost always unconstitutional unless the officer has obtained a judicial warrant to search and seize such personal property. See *Marron* v. *United States* (1927), 275 U.S. 192. In the instant cause, there is no question that the officer did not obtain such a warrant. Likewise, there is no question that appellant exerted a privacy and possessory interest in the grocery bag when the officer reached for it. Nevertheless, there are two narrowly circumscribed exceptions to the warrant requirement. One is where it is reasonable for an officer to believe that the arrestee will attempt to seize or destroy relevant evidence over which the *arrestee* may have control. *Chimel* v. *California* (1969), 395 U.S. 752. The court in *Chimel* also observed that the second exception to the warrant requirement is where the officer searches the *arrestee* in order to pro-

tect his own life. *Id.* at 762-763. See, also, *Terry* v. *Ohio* (1968), 392 U.S. 1. In *Terry, supra,* the court held that an officer could search an individual for weapons under certain circumstances. Obviously, *Terry* is in no way dispositive of the instant case. Here, the officer did not make an arrest prior to the search, and there is no indication that appellant was carrying a weapon or that the officer had any suspicion whatsoever that the appellant was carrying a weapon.

Upon a review of the facts *sub judice,* it is obvious that the majority's reliance on *Chimel* in order to justify the instant search is grossly misplaced and somewhat disingenuous. Unlike the instant cause, the defendant in *Chimel* was arrested *prior to* the search's taking place. In turning the *Chimel* holding on its head, the majority, in essence, places all Ohio citizens under "martial law" because under the majority's decision, a police officer may search one's person or personal property with impunity prior to placing the person under arrest. Such a rule of law is repugnant to a truly free and open society, and should never be countenanced by this court.

In any event, since the warrantless search conducted in this cause does not even come close to falling under any of the recognized exceptions to the Fourth Amendment requirements, the decision below must be reversed. The holding reached by the majority also clashes head-on with a number of other opinions by the United States Supreme Court. In *Recznik* v. *Lorain* (1968), 393 U.S. 166, the police had information that a particular apartment building was a gambling house, and the senior officer stated that he knew when he entered the apartment that he did not have enough evidence to make an arrest. *Id.* at 169. Of course, the high court held that the police did not

have probable cause to conduct a search of the apartment building. Similarly, in the instant cause, Officer Thomas admitted to his partner that he did not have enough evidence to detain appellant, let alone arrest him. Thomas only became suspicious of appellant because he saw him leaving what was believed to be a "drug house."

In applying *Recznik* to other aspects of the instant facts, it is apparent that the search of appellant's bag was not based upon "probable cause" that a crime was being committed. Thomas knew he did not have enough evidence to arrest appellant prior to searching the bag, but used the fruits of the illegal search as a justification for the subsequent arrest. Therefore, I am perplexed as to how the majority could misread the law in order to justify what was clearly an illegal search. Undoubtedly, the majority's *ex post facto* justification of the instant search is based wholly on the fact that illegal drugs were found in appellant's bag. However, it takes no citation of authority to understand that an illegal search is an illegal search regardless of whether the fruits recovered as a result are illegal drugs or everyday grocery products.

In another respect, the majority attempts to justify the unwarranted intrusion by the officers here by manufacturing a third exception to the warrant requirement. The majority cites *United States* v. *Place* (1983), 462 U.S. 696, for the proposition that the high court has created another exception to the warrant requirement. However, a careful reading of the *Place* opinion does not reveal such an expansive interpretation as proposed by the majority. In *Place, supra,* the Supreme Court recognized that personal property which is reasonably believed to hold contraband or evidence of a crime may

be temporarily detained. *Id.* at 706. Nevertheless, the *Place* court held that *before the personal property can be searched or permanently seized, a warrant must be issued. Id.* at 701. Once again, the majority contorts a precedent in a manner that is either careless, disingenuous or flat-out incorrect. To characterize the conduct of the officer in the instant cause as one sanctioned by *Place, supra,* is at best a severe misinterpretation of that holding, because such a misinterpretation reduces the Fourth Amendment to a mere "form of words." See *State* v. *Halczyszak* (1986), 25 Ohio St. 3d 301, 328, 25 OBR 360, 384, 496 N.E. 2d 925, 949 (Sweeney, J., dissenting).

Last, it must be reemphasized that an illegal search cannot be transformed into a constitutionally permitted one simply because illegal drugs are obtained as the fruits of the search. As aptly noted by Chief Justice (then Judge) Moyer in *State* v. *Hassey* (1983), 9 Ohio App. 3d 231, at 236, 9 OBR 403, at 409, 459 N.E. 2d 573, at 580:

"Facts acquired after a stop cannot provide justification for the stop."

The "end justifies the means" analysis employed by the majority should not be endorsed by this court at the expense of fundamental liberties that are to be enjoyed by all the citizenry. The rights embodied in the Fourth Amendment are much too precious to be tossed aside merely to sustain the conviction rendered below. While we as a society must endeavor to deal with the scourge of illegal drugs in a quick and effective manner, we must never sanction a solution that dispenses with the constitutional guarantees and personal liberties that

have made ours the most enduring government on the face of the Earth.

Accordingly, I would reverse the decision of the court of appeals below, and thereby reaffirm the Fourth Amendment and the freedoms it is intended to protect.

H. BROWN, J., concurs in the foregoing dissenting opinion.

WRIGHT, J., dissenting. We are facing a plague in our land as a result of drug abuse. The reaction of our leaders to this plague has been dramatic and in the main appropriate. However, the stability of American society rests on the fact that we are a nation of laws. The courts are sworn to defend our most fundamental laws— the state and federal Constitutions.

The majority well nigh concedes that appellant's Fourth Amendment rights were violated, but shrugs this intrusion off because of the greater value of stern law enforcement with respect to the war against trafficking in dangerous drugs. Such an approach is foreign to sound constitutional jurisprudence. I would point to the true rule regarding the adherence to constitutional principles as expressed in *Ex parte Milligan* (1886), 71 U.S. (4 Wall.) 2,[7] which was decided in the context of national peril and public unrest far greater than exists today. In refusing to ignore the force and effect of the plain English words used by our ancestors in framing the Constitution and the provisions of the Bill of Rights in particular, the United States Supreme Court stated:

"* * * Those great and good men foresaw that troublous times would

---

[7] In *Ex parte Milligan* (1886), 71 U.S. (4 Wall.) 2, the court granted a writ of habeas corpus holding that, absent martial law, a citizen of a nonrebel state was entitled to all the protections afforded by the Constitution. The petitioner had been sentenced to death for treason by a military tribunal in Indiana.

arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. *The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances.* No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority." (Emphasis added.) *Id.* at 120-121.

Likewise, the words of Judge Campbell, writing for the Supreme Court of Michigan in *People, ex rel. Twitchell,* v. *Blodgett* (1865), 13 Mich. 127, are applicable in this situation:

"* * * [S]pecific provisions may, in unforeseen emergencies, turn out to have been inexpedient. This does not make these provisions any less binding. Constitutions can not be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of the Government, until they are amended or abrogated by the action prescribed by the authority which created them." *Id.* at 139.

The Fourth Amendment is but one of the ten amendments constituting the Bill of Rights. The securities for personal liberty embodied in the Bill of Rights "were such as wisdom and experience had demonstrated to be necessary for those accused of crime. And so strong was the sense of the country of their importance, and so jealous were the people that these rights, highly prized, might be denied them by implication, that when the original Constitution was proposed for adoption it encountered severe opposition; and, but for the belief that it would be so amended as to embrace them, it would never have been ratified." *Ex parte Milligan, supra,* at 120.

The Fourth Amendment states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The people of Ohio, to doubly ensure their rights in this regard, adopted an almost identically worded provision in Article I, Section 14 of the Ohio Constitution. See, also, R.C. 2933.22.

Into these provisions were poured the living and sometimes bitter experiences of our forefathers struggling for independence from an unyielding and unfeeling despot. They realized the inherent temptation and persistent dangers of power. The simple words of the Fourth Amendment have an everyday importance and application that is as valid today as it always has been.

" 'We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magis-

trate between the citizen and the police. This was done not to shield criminals or to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.' " *Chimel* v. *California* (1969), 395 U.S. 752, 761 (quoting *McDonald* v. *United States* [1948], 335 U.S. 451, 455-456).

" 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " *Mincey* v. *Arizona* (1978), 437 U.S. 385, 395 (quoting *Johnson* v. *United States* [1948], 333 U.S. 10, 13-14).

Finally, the Fourth Amendment applies to "people, not places," *Katz* v. *United States* (1967), 389 U.S. 347, 351, and absent some special exception all containers and packages in one's possession will receive full protection of the Fourth Amendment. *United States* v. *Ross* (1982), 456 U.S. 798, 822. So when defendant Smith walked out of a private residence, during

daylight on a summer evening, carrying a paper grocery bag, he was shielded by the protections of the Fourth Amendment, and the burden is on the state to show the need to search defendant's bag without a warrant to do so. *United States* v. *Jeffers* (1951), 342 U.S. 48, 51.

The fact that defendant was merely carrying a grocery bag at his side with the top rolled down does not invalidate his privacy interest in that container. The central purpose of the Fourth Amendment forecloses distinctions between types of containers. "For just as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so also may a traveler [or anyone else] who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case." (Footnote omitted.) *United States* v. *Ross, supra,* at 822.

The facts in this case are that the police officers, without sufficient objective facts concerning *this particular defendant* to raise *any reasonable suspicion whatsoever,* stopped the defendant to question him. Then, with no probable cause to justify an arrest, and without the defendant's consent, the officers searched a closed container belonging to the defendant. Based upon what was found in the illegal search of the container, the officers arrested the defendant. Only at that time, according to the majority, was the defendant "seized" for purposes of the Fourth Amendment. This posture is, in my view, specious at best.

The majority at first finds no seizure under the Fourth Amendment and then finds probable cause sufficient to

justify an arrest of the defendant without a warrant. These findings purportedly are based upon the fact that defendant "threw" his closed grocery bag onto the hood of his car, and then tried to block an Ashland police officer's arm when the officer reached for the bag. In the words of Sergeant Thomas, this was what occurred after he asked Smith what was in the bag:

"Q. Did he make any response when you asked him what he had in the bag?

"A. Not right away.

"Q. What happened then?

"A. I started reaching for the bag, and he attempted to block my hand.

"Q. Then what happened?

"A. I pushed his hand away, and I unrolled the top of the bag.

"MR. COCKLEY: Excuse me. Your testimony was that you pushed his hand away?

"A. Yes.

"Q. And then what did you do?

"A. I unrolled the top of the bag.

"Q. As you pushed his hand away, did you say anything to him?

"A. What do you have in the bag?

"Q. Then what did he say?

"A. Then he said there's just a set of scales in there.

"Q. When you opened the bag, what did you see?

"A. The top of the four-beam scales."

The majority would characterize this encounter as a permissible police encounter in a public place rather than a justifiable Terry-type detention. One authority has suggested that a permissible encounter between the police and a member of the public becomes a seizure "if the officer engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen." 3 LaFave, Search and Seizure (1987) 413, Section 9.2(h). I submit that a reasonable man would construe the grabbing of his possession as an offensive gesture. Therefore, the cases construing Terry v. Ohio (1968), 392 U.S. 1, are applicable in this case.

The encounter occurred after the officers stopped to question the defendant on no more than an "inchoate and unparticularized suspicion or 'hunch'" that the defendant was involved in criminal activity. Terry v. Ohio, supra, at 27. Such hunches cannot be the basis of a stop authorized by Terry. Id. at 30. See United States v. Sokolow (1989), 490 U.S. ___, 104 L. Ed. 2d 1, 109 S. Ct. 1581. The officers did not know the defendant or his companion who were merely exiting a private residence on a June evening when it was still light. The only "suspicious" behavior was the defendant's carrying of a grocery bag while exiting from a residence where the authorities suspected drugs had been sold on an undefined former date.

The mere exiting from a house where suspected drug dealing might have occurred, without more, simply cannot be sufficient justification to stop and search someone and his possessions. To hold otherwise destroys almost everyone's right to privacy in his or her person. Even if a stop and a frisk for weapons under Terry, supra, is justified, a search of a closed container may not be justified. One court in granting a defendant's motion to suppress stated:

"[A Terry] frisk is only justified by an *officer's regard for his personal safety,* not by his interest in discovering contraband." (Emphasis added.) United States v. Gonzalez (S.D.N.Y. 1973), 362 F. Supp. 415, 423. The court went on to hold that even if a frisk had been justified with respect to an accused who had been observed in the company of a "notorious narcotics

dealer" in an area of "intense narcotics activity" the notoriety of the trafficker could not be imputed to the accused and the ensuing search of a brown paper bag carried by the accused exceeded the scope of a justified frisk. *Id.* at 421.

Most of the cases cited by the majority involving a "stop for questioning" concerned stops conducted by trained officers in an airport. Justice Powell in *Florida* v. *Royer* (1983), 460 U.S. 491, stated in his concurring opinion that "[i]n view of the extent to which air transportation is used in the drug traffic," such a stop "warrants special consideration." *Id.* at 508.

The suggestion is that law enforcement concerns are especially strong in airports, and I agree. However, *this* case involves the citizens of Ohio as they walk around their own neighborhoods. Moreover, the facts in this case do not even satisfy the rationale and requirements found in the airport search cases. In *Royer, supra; United States* v. *Mendenhall* (1980), 446 U.S. 544; *United States* v. *Place* (1983), 462 U.S. 696; and *United States* v. *Sokolow, supra,* the officials did not initiate the stop for questioning of any of the defendants on as flimsy a factual record as here. There were many more articulable facts to support each of the initial stops.[8] Most significant is the fact that *none* of these cases held that

---

[8] All these cases involved the use of a "drug courier profile" to identify travellers who can be subjected to questioning or a *Terry* stop by drug enforcement agents. In *United States* v. *Mendenhall* (1980), 446 U.S. 544, 547, the facts that supported the reasonable suspicion to stop the defendant were: "(1) the respondent was arriving on a flight from Los Angeles, a city believed by the agents to be the place of origin for much of the heroin brought to Detroit; (2) the respondent was the last person to leave the plane, 'appeared to be very nervous,' and 'completely scanned the whole area where [the agents] were standing'; (3) after leaving the plane the respondent proceeded past the baggage area without claiming any luggage; and (4) the respondent changed airlines for her flight out of Detroit."

In *United States* v. *Royer* (1983), 460 U.S. 491, 493, fn. 2, the court stated:

"* * * In Royer's case, the detectives['] attention was attracted by the following facts which were considered to be within the profile: (a) Royer was carrying American Tourister luggage, which appeared to be heavy, (b) he was young, apparently between 25-35, (c) he was casually dressed, (d) he appeared pale and nervous, looking around at other people, (e) he paid for his ticket in cash with a large number of bills, and (f) rather than completing the airline identification tag to be attached to checked baggage, which had space for a name, address, and telephone number, he wrote only a name and the destination. * * *"

In *United States* v. *Place* (1983), 462 U.S. 696, these facts were thought relevant by officials, as set forth in the district court's decision:

"1. Defendant Place was departing from a 'source city.'

"2. Defendant systematically scanned the immediate area in the lobby in which he was standing and looked very closely at each person that was seated or standing in that area.

"3. Defendant noticed and paid close attention to Mr. McGavock when he left the line.

"4. Defendant stared directly at the detectives two or three times as the detectives moved around the lobby.

"5. When buying his ticket and checking his baggage, the defendant turned and looked over his shoulder to scan the lobby once again.

"6. Defendant paid for his ticket in cash.

"7. After leaving the ticket counter and heading toward the gate from which he was to depart, defendant stopped for no apparent reason, turned around to look at anyone who might be behind him, and headed back to the lobby from where he had just come.

"8. Upon reaching the lobby, defen-

the circumstances providing justification for the original stop were sufficient to establish the probable cause necessary to arrest the suspects or to search luggage.[9]

The legality of the searches in *Royer* and *Mendenhall, supra,* depended upon the validity of the accused's consent since there were insufficient facts to otherwise provide probable cause to search his luggage. In *Royer,* the court held that the consent purportedly obtained was involuntary, that the search of Royer's luggage was therefore illegal, and that drugs found therein could not be used to provide the probable cause for his arrest. Conversely, in *Mendenhall,* the court held that the search was legal because the defendant had consented and that the contraband found could constitute probable cause to arrest. The facts in this case do not support any possible argument that the defendant consented to the seizure and search of his bag.[10]

---

dant Place walked a full circle around the lobby while looking back over his shoulder continuously to see if he was being followed." *United States* v. *Place* (E.D.N.Y. 1980), 498 F. Supp. 1217, 1224.

Finally, in *United States* v. *Sokolow* (1989), 490 U.S. ___, 104 L. Ed. 2d 1, 7-8, 109 S. Ct. 1581, 1583, these facts were considered relevant: "(1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage."

[9] As the plurality opinion in *Royer* stated in discussing the parameters of a permissible search of luggage:

"* * * First, it is unquestioned that *without a warrant* to search Royer's luggage and *in the absence of probable cause and exigent circumstances,* the validity of the search depended on Royer's purported consent. Neither is it disputed that where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. * * *

"Second, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. * * * Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. * * * The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. * * * He may not be detained even momentarily without reasonable, objective grounds for doing so; *and his refusal to listen or answer does not, without more, furnish those grounds.* * * * If there is no detention — no seizure within the meaning of the Fourth Amendment — then no constitutional rights have been infringed." (Emphasis added and citations omitted.) *Royer, supra,* at 497-498.

The opinion went on to discuss the *Terry* exception, which allows the detention of a person or his possessions upon less than probable cause "if there is articulable suspicion that a person has committed or is about to commit a crime. * * * [A] temporary detention for *questioning* [is justified] on less than probable cause where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crime." (Emphasis added.) *Id.* at 498-499.

[10] I agree with the majority's rejection of the court of appeals' view that the defendant "abandoned" his bag. In addition to *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 18 O.O. 3d 472, 414 N.E. 2d 1044, see

In *Place* and *Sokolow, supra,* the probable cause to search the defendants' luggage and arrest the defendants was provided by a narcotics dog alerting to the luggage. The court in *Place* held at 707 that a dog's sniffing of luggage is *sui generis* and is not a "search" within the meaning of the Fourth Amendment. The court in *Place* stated:

"The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog. Obviously, if this investigative procedure is itself a search requiring probable cause, *the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test—no matter how brief—could not be justified on less than probable cause.* * * *" (Emphasis added and citations omitted.) *Place, supra,* at 706. See, also, *Sokolow, supra,* at ____, 104 L. Ed. 2d at 9, 109 S. Ct. at 1584.

Once the dogs alerted, the drug agents in *Place* and *Sokolow* did what they should have done—they went to a neutral, detached magistrate and obtained a warrant to search the luggage. *Sokolow, id.; Place, supra,* at 699. The court in *Place* held that "the limitations applicable to investigative detentions of the person should define the permissible scope of all investigative detention of the person's luggage on less than probable cause." *Place, supra,* at 709. Because the officials held the luggage for too long before obtaining a warrant to search, the search was illegal and Place's conviction was reversed. *Id.* at 710.

Finally, the reliance upon *Chimel* v. *California* (1968), 395 U.S. 752, is misplaced, as the circumstances presented therein are notably different from those in this case. *Chimel* addressed the scope of a warrantless search *incident to a lawful arrest.* Because the arrest in *Chimel* was pursuant to an *arrest warrant* presumedly issued by a neutral, detached magistrate and based upon probable cause, the court stated, "we proceed on the hypothesis that the California courts were correct in holding that the arrest of the petitioner was valid under the Constitution." *Id.* at 755. Nevertheless, the search in *Chimel* was too broad and was held to violate the Fourth Amendment.

As the Supreme Court previously stated, "a search without a warrant is, within limits, permissible if incident to a lawful arrest, if an arrest without a warrant is to support an incidental search, it must be made with probable cause." *Henry* v. *United States* (1959), 361 U.S. 98, 102. "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Id.* "To repeat, an arrest is not justified by what the subsequent search discloses." *Id.* at 104. *Rawlings* v. *Kentucky* (1980), 448 U.S. 98, 111; *Johnson* v. *United States* (1948), 333 U.S. 10; *Commonwealth* v. *Trenge* (1982), 305 Pa. Super. 386, 403, 451 A. 2d 701, 710, fn. 8.

As stated, there were insufficient facts to justify a *Terry* stop in this case. The refusal of the defendant in this case to answer the officer's question or to surrender his bag did not provide grounds for a *Terry* detention of the defendant or a taking of his bag,

---

*United States* v. *Jackson* (C.A. 9, 1976), 544 F. 2d 407 (defendant was held not to have abandoned his suitcase when he dropped it and walked three steps away from it after officials addressed him), and *United States* v. *Savides* (N.D. Ill. 1987), 665 F. Supp. 686 (defendant held not to have abandoned his expectation of privacy when he placed his suitcase in the trunk of a car which he then followed in a second car).

and certainly did not provide probable cause for an arrest. All the circumstances must be considered and each case is fact-specific. However, no case is cited by the majority where similarly diffuse facts with respect to the accused were held to provide probable cause for a warrantless arrest or issuance of a warrant by a neutral, detached magistrate. The case law is, I submit, contrary to the majority's position. See *State* v. *Graddy* (1978), 55 Ohio St. 2d 132, 9 O.O. 3d 109, 378 N.E. 2d 723; *State* v. *Haynes* (1971), 25 Ohio St. 2d 264, 54 O.O. 2d 379, 267 N.E. 2d 787; *State* v. *Joseph* (1971), 25 Ohio St. 2d 95, 54 O.O. 2d 228, 267 N.E. 2d 125; *Henry, supra; Wong Sun* v. *United States* (1963), 371 U.S. 471; compare with *Draper* v. *United States* (1959), 358 U.S. 307; *United States* v. *Gomez* (C.A. 5, 1985), 776 F. 2d 542; *United States* v. *Wiecking* (C.A. 9, 1983), 757 F. 2d 969; *United States* v. *Errera* (D.C. Md. 1985), 616 F. Supp. 1145. See, generally, Annotation (1971), 6 A.L.R. Fed. 724.

In *Royer,* the state argued that there was probable cause to arrest the defendant even without a valid consent to the search. The court gave short shrift to that argument and stated, "[w]e cannot agree with the State, if this is its position, that every nervous young man paying cash for a ticket to New York City under an assumed name and carrying two heavy American Tourister bags may be arrested and held to answer for a serious felony charge." *Royer, supra,* at 507. Likewise, in this case, a man exiting a private residence, carrying a closed grocery bag "gingerly" and then placing or even throwing the bag on the hood of his car as he turns to face a police officer, has done nothing that creates probable cause to arrest him. Absent the probable cause to arrest him or a warrant based upon probable cause, the officer had no authority to open the bag, which was "seized" for Fourth Amendment purposes as soon as the officer pushed the defendant's arm away and grabbed the bag.

Nor is the state entitled to assert any of the other exceptions to the warrant requirement before searching defendant's bag, such as the automobile exception (see *United States* v. *Ross* [1982], 456 U.S. 798, 809-813); the plain view exception (see *Coolidge* v. *New Hampshire* [1971], 403 U.S. 443); or any other exigent circumstance.

The actions of the safety forces in this case may have been well intentioned, but what this case is about is whether their actions violated appellant's constitutional rights. In the words of Justice Sutherland, dissenting in *Home Bldg. & Loan Assn.* v. *Blaisdell* (1934), 290 U.S. 398, "[t]he only legitimate inquiry we can make is whether it is constitutional. * * * If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." *Id.* at 483. I am prepared to endure the "pinch" in this case, and thus I must respectfully dissent.

H. BROWN, J., concurs in the foregoing dissenting opinion.