**State v. Vajda**
[Cite as 2 AOA 385]

*Case No. 57854*
*Cuyahoga County, (8th)*
*Decided March 29, 1990*

*4th and 5th Amend. U.S. Const.*
*R.C. 2911.11*
*R.C. 2913.02*
*R.C. 2929.11*

*John T. Corrigan, Esq. Cuyahoga County Prosecutor, Steven Canfil, Esq., Assistant County Prosecutor, Justice Center - 8th Floor, 1200*

*Ontario Street Cleveland, OH 44113, For Plaintiff-Appellee.*

*John S. Pyle, Esq. Gold, Rotatori, Schwartz & Gibbons Co., 1500 Leader Building, Cleveland, OH 44114, For Defendant-Appellant Mary Jenks.*

*Michael C. Hennenberg, Esq. Greene & Hennenberg, 801 Bond Court Building, Cleveland, OH 44114, For Defendant-Appellant Dale Madison.*

MCMANAMON, J.

After a jury trial, Frank Vajda, Theresa Stojka, Anna Szarkezi and Maria Roy appeal their convictions of aggravated burglary (R.C. 2911.11) and theft (R.C. 2913.02). Their consolidated appeal raises twenty-four assignments of error based upon claimed constitutional violations resulting from prosecutorial misconduct, evidentiary and sentencing errors, the erroneous denial of their suppression motions and convictions entered against the manifest weight of the evidence.

Because we find their motions to suppress were improperly denied, and because their theft convictions were against the manifest weight of the evidence, we reverse the judgment of the trail court. We also find merit, in part, to their claim of prosecutorial misconduct.

On April 4, 1989 Stojka and Szarkezi approached eighty-two year old Guiseppa Occhiuto as she worked in her front yard in Cleveland's "Little Italy." Through an interpreter Occhiuto testified at trial that the women asked her to receive some perfume for a neighbor who was not at home. Occhiuto invited the pair into her kitchen, where, upon request, she gave them paper and a pencil. Because Occhiuto could not write an inventory of the merchandise, Szarkezi began writing while Stojka held up a large blanket, which she offered for sale, thus obstructing Occhiuto's view of the door. While Szarkezi wrote, Stojka repeatedly praised and hugged Occhiuto and finally asked her for a glass of water. Stojka put tablets in the water and placed the glass in front of Occhiuto, who did not drink from it. The women told Occhiuto to sign the inventory sheet and then left, taking it, as well as the perfume bottles they purportedly wished to leave for the neighbor, with them.

Michael Yafanaro, a nearby resident, noticed the women initially approach Occhiuto and, minutes later, observed Maria Roy emerge from a beige car, driven by Frank Vajda, and

enter Occhiuto's yard. As Yafanaro drove his truck out of the neighborhood he spotted Vajda parked nearby with a clear view of the Occhiuto residence.

Yafanaro sought the help of area Patrol Officer, Paul Bellito. The two returned to the scene in Yafanaro's truck and parked approximately 100 feet from the beige car while Bellito summoned backup police assistance.

Meanwhile, Frank Vajda picked up the three women near the Occhiuto residence. Once the four were in the car, Bellito ran from the truck, with his gun drawn, shouting, "Police, you are under arrest." Vajda put his car in gear, but hit Yafanaro's truck. Two of the women attempted to escape the car by telling Bellito they had "to pee" and "dropped a shoe." Roy attempted to climb out of a car window and, in response, Bellito summoned neighborhood "kids" to lock arms across the side of the car to prevent her departure. One of these civilians "tussled" with Roy after Bellito ordered him to "grab this girl."

Four police cars responded to the scene. Officers patted down the three women, handcuffed them and placed them in the back of a squad car. They also patted down Vajda and put him into another car. Police confiscated two of the women's purses from the automobile.

Police then sorted through the crowd to determine if their prisoners were the perpetrators of any crime. They directed Occhiuto and her son, Anthony Occhiuto, who arrived forty-five minutes later, in the midst of the investigation, to determine if anything had been taken from their home.

Mrs. Occhiuto discovered $800 missing from her bedroom. She remembers having two $100 and six $50 bills, with the remainder in $20 bills. Anthony Occhiuto reported that he found the lock broken off his wooden cash box and $980 missing from his upstairs bedroom. His money consisted of one $100 and six $50 bills, with the balance in $20 bills. The day following the incident he reported an additional six $5 bills and his collection of $80 to $100 worth of $2 bills to be missing.

The police confiscated approximately $2,017 cash from the four defendants. The reports reveal police took six $100, one $50, one $10, one $5 and one $1 bills, totalling $666, from Roy; one $100, one $50, two $20, one $10, three $5, two $1 bill and $2.06 in change, totalling $218.06, from Szarkezi; and eight $20, one $10 and six $5 bills, totalling $200, from Stojka. Detective Abernathy stated that, hours after the

arrest, in a jailhouse search where the female defendants were required to loosen and shake out their bras, another $570, in $50 and $20 denominations was found on Stojka. The police report used to refresh Detective Hancock's memory, however, indicated that this money was found in Szarkezi's undergarments. Trial testimony also revealed that Vajda carried $300 cash plus change. The police property envelope shows $363 taken from Vajda. Police recovered no $2 bills, explaining that the three women were erroneously allowed to use the restroom without handcuffs before the full body searches were conducted.

Contrary to R.C. 2933.41, police returned the alleged missing money to the Occhiutos, in denominations other than they had previously reported. This "restitution" occurred a few days after the incident.

Police also confiscated luggage and clothing from the trunk of Vajda's car, though admitting that the Occhiutos did not report clothing or luggage missing and despite the fact that none of the defendants opened the trunk of the car after leaving the Occhiuto house. The coats and other items confiscated from the trunk were attributed to Vajda as driver of the vehicle. Police acknowledged that they conducted their warrantless search of the trunk to uncover evidence which might link the four to other crimes.

The state indicted the four defendants on one count each aggravated burglary, theft and the possession of criminal tool perpetrated against Guiseppa Occhiuto. The state prosecute Vajda, the driver of the "get away" vehicle, as an aider at abettor. At trial the state amended the complaint to add Anthony Occhiuto as a victim.

The trial court found probable cause for an arrest and reasonable suspicion for an investigative stop and so denie defendants' motions to suppress.

A jury found the four guilty of aggravated burglary an theft, but acquitted them on possession of criminal tool charges.

I

All of the parties challenge the denial of their motions to suppress. We will address this issue first.

A police officer may conduct an investigative stop and protective search of an automobile if he has a "reasonable suspicion" of criminal activity taking place. *State* v. *Bobo* (1988), 37 Ohio St. 3d 177. The officer "must be able to point to specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio* (1968), 392 U.S. 1, 21. The circumstances necessitating the stop must be viewed as a whole. *State* v. *Freeman* (1980), 64 Ohio St. 2d 291. A court must determine that the facts available to the officer at the time of the stop were sufficient for a reasonable person to believe that the officer's actions were appropriate. *Terry, supra,* at 21-22.

Officer Bellito stated at the suppression hearing that approximately six "scams" were perpetrated in Little Italy during the year preceding this incident. Several occurred the year before. During the month and one half preceding this incident, Bellito authored a police report involving "con game activity" in Little Italy and "heard" of two additional incidents. He also testified he had received intelligence regarding "female suspects" and a beige car. Counsel did not elicit testimony as to the nature of the information and/or the reliability of Bellito's informants.

Bellito circulated the information around the neighborhood by word of mouth and by an article he placed in the neighborhood newspaper *Chiachieroni.*

Bellito read his article into the record:

"Attention Mayfield-Murray Hill residents. I have received reports of some scam artists working the area, using some scams, as looking for apartments or utility persons or selling Avon products.

"Once in the home, they keep the residents occupied. And another person, not seen, slips in the unlocked door and steals items from the bedroom area. Be aware of this and other reported persons that represent themselves as repairmen, driveway or roof or sealcoat repairmen.

"If you feel suspicious or come in contact with anyone, please contact Officer Paul Bellito at 721-1006, at Alta House, or call the Police Emergency No. 911." (Tr. 72).

Bellito further acknowledged that he solicited aid from neighborhood "kids" by shouting out that the car occupants had just "robbed" someone, though he did not know that to be so. At the time, his only specific and articulable information came from Yafanaro's observation of strangers approaching an old woman in her yard. Where an officer sees suspicious activity in a "high crime" area, he may briefly stop the suspicious individual in order to determine his identity or to momentarily maintain the *status quo* while obtaining more information. *Bobo, supra; Freeman, supra.* A mere suspicion, with no trace of evidence that the suspects committed a crime, or were going to commit one, is insufficient to justify a stop. *State* v. *Stamey* (June 16, 1976), Summit App. No. C.A. 8027, unreported.

We find, in light of the reports of "con artist," the observation of strangers in the neighborhood in company with an aged, non-English speaking female resident, was sufficient to justify an investigative stop of the defendants.

Police, however, may not investigate their suspicions by means approaching the conditions of arrest. *Florida* v. *Royer* (1983), 460 U.S. 491, 500. They should utilize the least intrusive means to investigate their suspicions. *Id.* A person is "seized" if, under the totality of the circumstances, a person would reasonably believe he is not free to leave. *United States* v. *Mendenhall* (1980), 446 U.S. 544, 554; *State* v. *Smith* (1989), 45 Ohio St. 3d 255, 257. Such circumstances include the officer's display of a weapon, his threatening presence and the use of language suggesting that compliance with his request is required. *Mendenhall, supra; Smith, supra.*

Bellito leaped out of the truck, brandishing a gun, shouting, "Police, you are under arrest." He pointed his gun at the occupants of the car, soliciting the help of enough neighborhood "kids" to prevent the defendants from emerging. Four reinforcement vehicles arrived with flashing lights, and patrolmen and detectives converged on the scene with loaded weapons drawn.

There is no question that the totality of the circumstances illustrated that the defendants were seized within the meaning of the Fourth Amendment. As this seizure was clearly beyond an investigative stop, we must determine if police had probable cause to make a warrantless arrest.

To make such an arrest, a police officer must have probable cause to believe a felony has been committed. Probable cause requires that the officer act only upon sufficient information from a reliable source that would lead a prudent person to believe that the accused committed the felony. *State* v. *Timson* (1974), 38 Ohio St. 2d 122, paragraph one of the syllabus. Probable cause must exist at the moment of the arrest. *Beck* v. *Ohio* (1964), 379 U.S. 89, 91.

At the moment Bellito shouted, "Police, you are under arrest," there was no information that

the defendants had committed a felony. Guiseppa Occhiuto did not know that money was missing. Anthony Occhiuto was not yet at the scene.

When there is no probable cause to arrest, an unlawful arrest cannot be made good by what a subsequent illegal search uncovers. *Wong Sun* v. *United States* (1963), 371 U.S. 471.

We find that police lacked probable cause to arrest the defendants and so the trial court erroneously denied the defense motions to suppress the evidence obtained as a result of the illegal arrests.

These assignments are well taken.

## II

All of the defendants urge that their convictions were against the manifest weight of the evidence.

All were convicted of aggravated burglary and theft.

R.C. 2911.11 sets forth in relevant part:

"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure, as defined in section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony, when any of the following apply:

"***

"(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present."

R.C. 2913.02 states in relevant part:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

"(1) Without the consent of the owner or person authorized to give consent;

"***

"(3) by deception ***."

Section 2923.03 states in relevant part:

"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

"***

"(2) Aid or abet another in committing the offense ***."

Though evidence may be sufficient to sustain a guilty verdict, an appellate court has the power to determine that the verdict is against the weight of the evidence. *State* v. *Robinson* (1955), 162 Ohio St. 487. Such a review looks to the entire record and requires the court to weigh that evidence and all reasonable inferences, consider the credibility of witnesses and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State* v. *Davis* (1988), 49 Ohio App. 3d 109; *State* v. *Martin* (1983), 20 Ohio App. 3d 171, 175. A reviewing court will not reverse a conviction where there is evidence substantial enough for the court to decide all elements of the offense were proven beyond a reasonable doubt. *State* v. *Eskridge* (1988), 38 Ohio St. 3d 56, paragraph two of the syllabus.

*State* v. *Mattison* (1985) 23 Ohio App. 3d 10, set forth the following factors to determine whether a decision is against the manifest weight of the evidence:

"(1) The reviewing court is not required to accept as true the incredible;

"(2) whether the evidence is uncontradicted;

"(3) whether a witness was impeached;

"(4) what was not proved;

"(5) the certainty of the evidence;

"(6) the reliability of the evidence;

"(7) whether a witness' testimony is self-serving;

"(8) whether the evidence is vague, uncertain, conflicting or fragmentary."

Bellito and Yafanaro's testimony placed the four defendants at the Occhiuto house. Mrs. Occhiuto's testimony showed that Stojka and and Szarkeni entered her home at her invitation. Though neither Occhiuto gave permission for any of the defendants to enter the bedrooms or to take money from the house, neither the victims nor the witnesses saw any of the defendants go upstairs to the bedrooms. This activity could be inferred, however, from Yafanaro's observation of Roy entering the Occhiuto yard alone, after Stojka and Szarkezi accompanied Mrs. Occhiuto inside and otherwise distracted her.

We also note that witnesses continuously watched Vajda, Stojka and Szarkezi throughout the incident. After Roy entered the yard, she was unnoticed until seen later with Stojka and Szarkezi. Various amounts of money were found on all four defendants, including Vajda, who never left his car.

The money recovered from the defendants did not match the denominations the Occhiutos claim were missing from the house. Further, police confiscated money from the defendants while Bellito went to the Occhiuto home to ask

if any was missing. Police testimony conflicted as to the amounts and where, when, and from whom the money was actually seized.

Police testified at trial that a few days after the incident they returned the amounts of money Mrs. Occhiuto and her son alleged were missing. Though the Occhiutos had reported a combined total of three $100 bills, and the remainder in $50, $20, $5 and $2 denominations, to be missing, police returned the cash almost entirely in $100 bills.

R.C. 2933.41 sets forth in relevant part:

"(A) any property, other than contraband that is subject to the provisions of section 2933.43 of the Revised Code and other than property that has been lawfully seized in relation to a violation of section 2933.42 of the Revised Code, that has been lost, abandoned, stolen, seized pursuant to a search warrant, or otherwise lawfully seized or forfeited, and that is in the custody of a law enforcement agency, shall be kept safely pending the time it no longer is needed as evidence, and shall be disposed of pursuant to this section. ***

"***

"(C) A person loses any right he may have to the possession of property if either of the following apply:

"(1) The property was the subject, or was used in a conspiracy or attempt to commit, or in the commission, of an offense other than a traffic offense, and such person is a conspirator, accomplice, or offender with respect to the offense;

"(2) When a court determines that the property should be forfeited because, in light of the nature of the the property or the circumstances of such person, it is unlawful for the person to acquire or possess the property."

R.C. 2933.41 (A) requires law enforcement agencies to keep any lawfully seized property safe until such time as it is no longer needed as evidence.

Possession of money is not, by itself, sufficient to prove an unlawful act. *State* v. *Clark* (May 11, 1989), Cuyahoga App. No. 55402, unreported; *Chagrin Falls* v. *Loveman* (1986), 34 Ohio App. 3d 212; *State* v. *Jacobs* (1940), 137 Ohio St. 363. By giving the money taken from the defendants to the Occhiutos before trial, the police, in effect, determined that the defendants had stolen that money from them. Further, the police testimony, that they returned the stolen money to the Occhiutos, hopelessly prejudiced the defendants and took from the jury the question of whether the defendants, in fact

committed theft in violation of R.C. 2913.02 While the evidence may be sufficient to infer that the defendants were trying to perpetrate a scam on Mrs. Occhiuto, the evidence tending to show that the defendants stole the money found on them from Mrs. Occhiuto and her son is tenuous at best.

Based upon the foregoing, we must find the evidence was neither certain nor substantial enough to persuade us that the jury did not lose its way. As result, we find the defendants' theft convictions must be reversed as against the manifest weight of the evidence.

We will not reverse the convictions for aggravated burglary, however, as against the manifest weight of the evidence, because, in considering all of the evidence presented, a reasonable jury could concluded the state demonstrated the three women either surreptiously or by deception entered the Occhiuto house with the purpose to knowingly obtain control over property belonging to Guiseppa and Anthony Occhiuto, without their consent.

We also decline to reverse Vajda's conviction for aggravated burglary as being against the manifest weight of evidence because, in light of the foregoing, the state presented sufficient evidence to establish he aided and abetted the women by driving them to the scene, parking at a nearby vantage point so he could monitor their activities at the house and his sudden appearance near the house so the women could jump into the vehicle when they emerged from the house. *State* v. *Johnson* (Mar. 7, 1985), Cuyahoga App. No, 48468, unreported.

These assignments are well taken in part.

III

All of the defendants claim that prosecutorial misconduct deprived them of a fair trial. They cite prosecutors' comments on their failure to testify, their comments during closing arguments that defendants are "seasoned con artists" and their use of evidence of prior acts in violation of Evid. R. 404(B).

In their fourth assignment of error, Stojka and Szarkezi both also allege the trial court erred in admitting evidence of the same prior similar acts in violation of Evid. R. 404(B). We will jointly address these Evid. R. 404(B) issues in the context of judicial error and prosecutorial misconduct. These objections are all based on the testimony of the Occhiutos' neighbor, Elissa Plalatzzo, that two women approached her earlier the same day asking to leave a package

for an absent neighbor. She identified Roy, one of the women, but could be identify the other.

Evid. R. 404(B) states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

R.C. 2945.59 states:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

Evidence of other acts is admissible if it tends to shown the defendant's motive, intent, scheme or plan and if it is relevant to the offense charged. *State* v. *Coleman* (1988), 37 Ohio St. 3d 287, 291, paragraph three of the syllabus. When evidence is introduced for this purpose, the prosecution must show a connection existed, in the defendant's mind, between the offense in question and the other acts. *State* v. *Burson* (1974), 38 Ohio St. 2d 157, at 159.

With Plalatzzo's testimony, the prosecution attempted to show that defendants were roaming the Little Italy neighborhood in an effort to perform "scams" upon elderly women. As this evidence tends to show a scheme or plan which is relevant to the crimes charged, the prosecution properly offered it and the court properly admitted it. *Coleman, supra.*

The conduct of a prosecuting attorney is error only if it deprives the defendant of a fair trial. *State* v. *Wade* (1978), 53 Ohio St. 2d 182, vacated on other grounds, 438 U.S. 94; *State* v. *Baker* (July 14, 1988), Cuyahoga App. No. 54439, unreported. To determine if reversible error exists, a reviewing court must decide if remarks prejudiced substantial rights of the defendants. *State* v. *Smith* (1984), 14 Ohio St. 3d 13; *State* v. *Pearson* (Aug. 3, 1989), Cuyahoga App. Nos. 55609 and 55610, unreported.

In deciding whether a defendant was denied a fair trial, this court must determine whether the fact finder would have found the defendant guilty absent the prosecutor's remarks. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, certiorari denied 472 U.S. 1012; *State* v. *Baker, supra.*

During closing argument, a prosecutor referred to defendants as "seasoned con artists."

In a case where the prosecutor called the appellant a "two minute stud," "a dope smoking booze soaked brain individual," "a night stalker," "degenerate" and "clown," this court said:

"While we do not condone such tactics and the assistant prosecutor's argument would have fared just as well without them, these characterizations were not entirely beyond the realm of what the evidence suggests. Cf. *State* v. *Chandler* (1984), 19 Ohio App. 3d 109, 112." *State* v. *McAdams* (Mar. 17, 1988), Cuyahoga App. No 53593, unreported, at 6.

Because we cannot say the defendants were denied a fair trial based solely upon this remark, we do not find this argument to be well taken. The defendants' remaining contentions, however, are another matter.

None of the defendants testified at trial. In the course of closing remarks to the jury the prosecutor commenced a series of statements concerning defense counsel. Each sentence commenced with the word "They."

"They forgot a lot. They forgot to tell you why these defendants were in Mrs. Occhiuto's home. They forgot to tell you why they were in her home waving this around (indicating).

"Because, you see, they never denied that these defendants were in the home.

"MR. WILLIS: Objection.

"THE COURT: Overruled.

"MR. GRAYS: They forgot to tell you why they didn't leave this perfume. They forgot to tell you why Maria Roy jumped out of the driver's door or window, trying to get away.

"They forgot to tell you why Maria Roy was walking away from the scene after the police arrived.

"MR. WILLIS: Objection.

"THE COURT: Overruled.

"MR. GRAYS: They forgot to tell you why Frank Vajda, after Patrolman Bellito said, 'Police, you are under arrest,' why he put his car in drive and attempted to drive away.

"He forgot to tell you why Theresa Stojka tried to hide the money that she took out of her bra.

"Now, if they had absolutely nothing to do with robbing [*sic*] Mrs. Occhiuto and Mr. Occhiuto, why are they trying to get away? Why

is she hiding this money in her bra?" (Tr. 598-600).

The defense rested after the state's case and the court, in closing, properly instructed the jury on a defendant's right to silence.

The Supreme Court has held:

"A reference by the prosecutor in closing argument to uncontradicted evidence is not a comment on the accused's failure to testify, where the comment is directed to the strength of the state's evidence and not to the silence of the accused, and the jury is instructed not to consider the accused's failure to testify for any purpose." *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, paragraph one of the syllabus; *State* v. *Phillips* (Apr. 13, 1989), Cuyahoga App. No. 55214, unreported.

In examining the state's entire closing argument, we find the jury could easily have concluded that the prosecutor was commenting on the silence of the accused. Although a curative instruction was ultimately included in the court's final remarks, the prosecutor's emphatic litany prevents a finding that the defendants were not unfairly prejudiced.

The burden of defense counsel is to hold the state to its proof, not to testify. In chastising counsel for failure to meet a non-existent burden, the state did not confine its remarks to the strength of its evidence and we cannot say the jury was not compelled by those remarks to consider the failure of defendants to testify.

We find merit to this claim.

### IV

The defendants all challenge their sentences. They argue that the trial court erroneously failed to order presentence reports, that the court sentenced them to an unreasonable and illegal term based solely on its views of their national origin and that such term is cruel and unusual punishment in violation of the Eighth Amendment.

Aggravated burglary is a felony of the first degree. R.C. 2911.11(B). R.C. 2929.11(B) states that the penalty for a first degree felony is a minimum of five to ten years (which may be imposed as actual incarceration) and a maximum of twenty-five years.

If the property stolen is valued at $300 or more, but is worth less than $5,000, the theft is a fourth degree felony. R.C. 2913.02(B). A fourth degree felony is punishable by a six month, one year or eighteen month term of imprisonment. R.C. 2929.11(D) (2).

The court sentenced each of the four defendants concurrently to actual minimum terms of eight years to twenty-five years imprisonment on the aggravated burglary conviction and one year on the theft conviction. We will not reverse a trial court's discretion in sentencing so long as it is within the statutory limits as it is here. *Toledo* v. *Reasonover* (1965), 5 Ohio St. 2d 22; *State* v. *Garfield* (1986), 34 Ohio App. 3d 300; *State Cassidy* (1984), 21 Ohio App. 3d 100.

The decision to order a presentence report pursuant to < * > R. 32.2(A) is within the trial court's sound discretion. *State v. Adams* (1988), 37 Ohio St. 3d 295. The plain language of R. 32.2(A) makes the report mandatory when the court order probation in a felony case. An aggravated first degree felony committed by a previous offender, mandates an actual minimum term of ten to fifteen years. R.C. 2929.11(B)(1)(b). For the same crime committed by a first offender, the court may impose an actual minimum term of five to ten years. R.C. 2929.11(b)(1)(a). The trial judge apparently opted to treat the defendants as first offenders.

The court specifically stated, with regard to the presentence report request:

"The court did not determine to refuse the request lightly. As a matter of fact, normally this court would make that referral just as a matter of course.

"However, in the circumstances appearing before the court at this time, the court finds that -- and all of this was pretty much brought out at the hearing on the bail request a week ago, that apparently the defendants all have aliases. I have heard that they live in various cities.

"But except for Frank Vajda, who has presented what appears to, or purports to be a copy of a deed to premises in New York or rather, in Buffalo, the other defendants have given addresses here which are either non-existent or at which they are unknown.

"A referral to the Probation Department for a person who does not have a set address to begin with, and who uses aliases in [*sic*] apparently by the dozens here, would be to ask the Probation Department to do an impossible task." (Tr. 707-708).

We find the trial judge did not abuse his sentencing discretion in not ordering a presentence investigation report.

R.C. 2929.12 however, provides:

"(A) In determining the minimum term of imprisonment to be imposed for a felony for which an indefinite term of imprisonment is imposed, the court shall consider the risk that the offender will commit another crime and the

need for protecting the public from the risk; the nature and circumstances of the offense; the victim impact statement prepared pursuant to section 2947.051 [2947.05.1] of the Revised Code, if a victim impact statement is required by that section; and the history, character, and condition of the offender and his need for correctional or rehabilitative treatment.

"(B) The following do not control the court's discretion, but shall be considered in favor of imposing a longer term of imprisonment for a felony for which an indefinite term of imprisonment is imposed:

"(1) The offender is a repeat or dangerous offender;

"(2) Regardless of whether the offender knew the age of the victim, the victim of the offense was sixty-five years of age or older or permanently and totally disabled at the time of the commission of the offense;

"(3) The victim of the offense has suffered severe social, psychological, physical, or economic injury as a result of the offense.

"(C) The following do not control the court's discretion, but shall be considered in favor of imposing a shorter minimum term of imprisonment for a felony for which an indefinite term of imprisonment is imposed:

"(1) The offense neither caused nor threatened serious physical harm to persons or property, or the offender did not contemplate that it would do so;

"(2) The offense was the result of circumstances unlikely to recur;

"(3) The victim of the offense induced or facilitated it;

"(4) There are substantial grounds tending to excuse or justify the offense, though failing to establish a defense;

"(5) The offender acted under strong provocation;

"(6) The offender has no history of prior delinquency or criminal activity, or has led a law abiding life for a substantial time before commission of the present offense;

"(7) The offender is likely to respond quickly to correctional or rehabilitative treatment.

"(D) The criteria listed in divisions (B) and (C) of this section do not limit the matters that may be considered in determining the minimum term of imprisonment to be imposed for a felony for which an indefinite term of imprisonment is imposed."

Ordinarily, we presume the trial court considered the R.C. 2929.12 factors. *Adams,*

*supra.* The defendants, however, urge that the trial court imposed harsh sentences on them because they are Gypsies. During the sentencing hearing, the trial court opined that Gypsies create their own law and traditionally wander the world, creating havoc wherever they go. He also instructed a person identified as the Gypsy King, who appeared at the sentencing hearing, to heed this proceeding as a warning to his "caravan" that "the State of Ohio is not any place to come and apply your trade."

The trial judge, in the pretrial motions hearing, indicated that the defendants had rap sheets approximately three to four feet long. Thus, he could conclude reasonably that the risk of the defendants committing another offense was great. He indicated his consideration of the victims' ages and impact statements. The court also encouraged defense counsel to describe each defendant's background and to present mitigating factors to be considered. The record reflects the defendants' minor children, prior convictions, aliases, unknown addresses and the nonviolent nature of the crime were also considered.

While we considered the court to have expressed anti-Gypsy comments reflecting upon the defendants, because the court imposed a sentence in compliance with statutory guidelines, we are unable to say these remarks were the basis of the court's action. *Toledo, supra; City of Cleveland* v. *Crawford* (Sept. 28, 1989), Cuyahoga App. Nos. 55899 and 55900, unreported.

Further, a close scrutiny of the complete trial record fails to demonstrate that any of the court's rulings, whether correct or erroneous, stemmed from judicial ill will or prejudice against the defendants. These assignments consequently fail

We must note, however, that justice requires "the cold neutrality of an impartial judge." *Burke, Preface to Brissot's Address.* "A trial court should refrain from intemperate commentary which might affect public confidence in the trial process." *Crawford, supra.*

Finally, in her eighth assignment of error, Roy contends her constitutional rights were violated because the court required her, and the three other defendants, to wear shackles during the sentencing hearing. She alleges that even though the sentence would be the same, in the absence of the shackles, their use was constitutionally improper.

R.C. 2945.03 gives the trial judge control over all proceedings during a criminal trial. R.C. 2945.04 allows a trial court to call upon a law enforcement agency to protect victims or witnesses in a criminal case. From the record in this case it appears that a sheriff's deputy made the decision to shackle the defendants.

There is no indication that the defendants were shackled as the result of any order by the trial judge. Counsel cites no case law nor can we find any which would compel reversal because the sheriff brought shackled prisoners to a sentencing hearing.

This assignment fails.

*Judgment reversed, and*
*cause remanded.*

DYKE, P.J., AND SWEENEY, J., Concur.

SWEENEY, J., Concurring:

I find it necessary to write a concurring opinion regarding the prosecutor's comments on defendants' failure to testify because in the past twelve to fifteen months, I have observed an erosion of the right of defendants not to testify. Each time we have denounced the prosecutor's conduct as improper, but, nevertheless, have held the improper comments to be harmless error. *See, State* v. *Pearson* (Aug. 3, 1988), Cuyahoga App. Nos. 55609 and 55610, unreported; *State* v. *Phillips* (Apr. 13, 1989), Cuyahoga App. No. 55214, unreported; *State* v. *Shaw* (Jan. 26, 1989), Cuyahoga App. No. 44214, unreported. In treating these cases as harmless error, it appears prosecuting attorneys have taken each subsequent case one step further, without fear of reversal. Justice Wright, concurring in *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 293, warned the majority that each time it allows prosecutorial misconduct to continue unheeded, it is "... permitting the state to further chip away at the right to fundamental due process and a fair trial pursuant to the Fifth and Fourteenth Amendments to the United States Constitution." "If prosecutors win verdicts as a result of "disapproved" remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure." *Id.* In *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, the Supreme Court stated, "Prosecutors must therefore take care not to equate the defendant's silence to guilt. Futher, they must be aware that where such comments

work to the material prejudice of the defendant, they will not be tolerated."

In concurring with Judge McManamon, I feel that in this case, where no witnesses testified for the defense, the statements comenced with the words "they forgot ..." were blatant comments on the defendants' failure to testify. The state's evidence is not so strong that we can say it is clear beyond a reasonable doubt that, absent the prosecutors' improper comments, the jury would have found defendants guilty. *See, State* v. *Smith* (1984), 14 Ohio St. 3d 13. This comment on the defendants' failure to testify substantially prejudiced the defendants' rights and warrants a reversal.

In the future, we will look closely at such conduct to assure that defendants' rights are protected. While I hope that this conduct will end with the reversal of this case, be forewarned that where similar conduct is observed in the future, it will not be condoned by this Court and will require the same outcome: reversal.